**Jose Manuel Froylan Diaz MARIN,
Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 21718.**

United States Court of Appeals
Fifth Circuit.

Nov. 2, 1965.

---

M. Gabriel Nahas, Jr., Houston, Tex., for appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., Woodrow Seals, U. S. Atty., William A. Jackson, William B. Butler, Asst. U. S. Attys., Houston, Tex., for appellee.

Before BROWN and COLEMAN, Circuit Judges, and MORGAN, District Judge.

COLEMAN, Circuit Judge.

The Appellant was indicted for the offense of having conspired with Emma Hinojosa, with Adela Gomez de Castillo, and with others to smuggle heroin into the United States, and to conceal and facilitate the transportation of heroin, knowing it to have been unlawfully brought into the United States, in violation of Title 21 U.S.C.A. § 174.[1]

The formation and operation of the conspiracy was testified to by one of the conspirators, Adela Gomez de Castillo, a Mexican national, married, mother of two children and, during the time in question, a resident of Monterrey, Mexico.

Mrs. Castillo testified that she knew the Appellant as "Willy Oliveira", and that after he had become aware of her family's distressed financial situation. Appellant propositioned her to make trips into the United States in accordance with his instructions. Mrs. Castillo agreed to the proposition and thereafter made two such trips into the United States, the first to Chicago, Illinois, and the second to Houston, Texas.

On the first trip, Adela Castillo said she traveled by bus from Monterrey to Reynosa, Mexico, located on the Mexico-United States border, where she met the Appellant at a private house and received from him further instructions concerning the trip. Appellant furnished Mrs. Castillo several small pieces of paper on which her instructions were written in

---

1. "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States * * * contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense * * * the offender shall be imprisoned not less than ten or more than forty years, and in addition, may be fined not more than $20,000."

English on one side and in Spanish on the reverse, covering such things as travel, how to get to the proper hotel, and other details of the trip. The Appellant told Adela Castillo that a suitcase would be delivered to her at a gas station-garage located in McAllen, Texas, and that she was to carry the suitcase to Chicago. While at the house in Reynosa, the Appellant also gave Mrs. Castillo the key to the suitcase which she would later receive in McAllen.

Thereafter, Mrs. Castillo crossed the border to McAllen, proceeded to the filling station, where a man delivered the suitcase to her, then took a cab to the bus station and there boarded a bus for Houston.

Upon her arrival in Houston, Adela Castillo went to Houston International Airport and bought a round trip ticket from Houston to Chicago, Illinois, and return with money furnished her for such purpose by the Appellant, utilizing the written instructions set forth on the pieces of paper.

Upon her arrival in Chicago, Illinois, Adela Castillo went directly to the La-Salle Hotel in Chicago, where she registered in accordance with her instructions as "Rosa Martin" of 1132 NE 7th Avenue, Miami, Florida.

Mrs. Castillo further testified that after she had checked into the hotel, she received a telephone call at her room between 7:00 and 8:00 p. m. from a Spanish-speaking male saying that someone would arrive at the hotel shortly to pick up the suitcase. Later she received another telephone call from a person speaking poor Spanish who told her to bring the suitcase from the room to the hotel lobby.

Upon arriving in the lobby she met the person later identified as Milton Abramson, also called Milton Bennett, whereupon they paid the hotel bill and checked out of the LaSalle. Together with Abramson she walked out of the hotel, handing the suitcase to Abramson, who in turn placed it in a nearby car which was then driven away. Adela Castillo promptly took a cab back to the Chicago airport and boarded an airplane for Houston.

The records of the LaSalle Hotel Company indicate that "Rosa Martin" checked out of the LaSalle Hotel at 9:12 p. m. on the same day of her arrival, October 10, 1962.

The records of Delta Airlines in evidence also indicate that the return portion of the Houston-Chicago-Houston round trip ticket was turned in and another ticket issued in its place to passenger Castillo for passage on Delta Flight 69N, departing O'Hare Field at Chicago, Illinois, at 12:40 a. m. on October 11, 1962, for Memphis and for passage thence to Houston on Delta Flight 65N. They further show that a refund was made by Delta Airlines check to passenger Castillo of Monterrey, Mexico, in the amount of $14.19, being the difference in ticket prices resulting from this rerouting. This Delta Airlines check is endorsed "Adela Gomez Castillo."

Mrs. Castillo testified that upon arriving in Houston from Chicago, she went directly to the bus terminal and there caught a bus back to McAllen, Texas.

Mrs. Castillo said that the Appellant paid her a total of 7,000 pesos (approximately $560.00) for the first trip, paying her a part of the money in advance and the balance upon her return.[2]

Thereafter, the appellant asked Adela Castillo to make another trip, this time to Houston, Texas. Accordingly, she traveled from Monterrey, Mexico, to the same house in Reynosa on the border, where she again met the Appellant. The instructions given to her by the Appellant were similar to those for the first trip. Appellant advised her that someone would deliver the suitcase to her in McAllen, Texas, he gave her instructions on pieces of paper as had been done before, and he again gave her the key to the suitcase which she would receive in McAllen. Mrs. Castillo identified the suitcase key given to her by the Appellant for the

2.  Milton Abramson gave Adela Gomez de Castillo $90.00 at Chicago.

Houston trip. Appellant told Mrs. Castillo that she would meet the same person in Houston as she had met in Chicago.

Thus, the witness said, she crossed the border and went to the same McAllen, Texas, filling station, where she waited until the same man delivered the suitcase to her. She next went to the bus station at McAllen, and boarded a bus for Houston, Texas, at about 7:00 o'clock that evening, arriving in Houston early the following morning. When she arrived in Houston, she followed the instructions written on one of the papers prepared by the Appellant to take a cab from the Houston bus station to the hotel where she had been instructed to bring the suitcase.

As Mrs. Castillo was entering the Texas State Hotel at Houston, she was arrested by Customs Agent M. R. Blackwell and others, who had followed her from the bus station to the hotel.

Mrs. Castillo said that the Appellant had instructed her to register as "Maria Martinez," using a Miami, Florida, address. Upon her agreement to do so, she was taken back to the Texas State Hotel by Customs Agents, and she then registered under the name "Maria Martinez".

Mrs. Castillo received a telephone call at her room at about 11:00 a. m. and then went to the hotel lobby, where she met Milton Abramson or Bennett. She had left the suitcase in the room, and when she met Abramson in the hotel lobby, he told her to go back to her room and get it. Mrs. Castillo gave Abramson the key to the suitcase. Hugh Woods, Room Clerk, Texas State Hotel, testified that the key was later found in the hotel lobby in a place where he had observed Abramson stand while waiting for Adela Castillo to return with the suitcase.

After Mrs. Castillo returned to the lobby with the suitcase, as she and Abramson were entering a cab parked outside of the hotel, Abramson was arrested.

The suitcase contained about 22 pounds of 99.3% pure heroin of an ultimate value of eleven million dollars.

Subsequent to the commission of the offense charged, Appellant, a Cuban national, was expelled from Mexico by the Mexican authorities and thereupon arrested within the Southern District of Texas.

The defense offered no testimony of any kind and the above statement of facts remains unchallenged in this record.

From the foregoing it will be seen that there can be no question as to the guilt of the defendant.

As stated in Rocha v. United States, 9 Cir. 1961, 288 F.2d 545, the question is: Can United States law have extraterritorial jurisdiction?

■ Or, stated another way, did the District Court have jurisdiction to indict and try an alien found physically within the Court's jurisdiction for a crime committed against the United States at a time when the offender was corporeally out of the jurisdiction of the United States?

The answer is in the affirmative.

In Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927) the defendants were at all times without the territorial limits of the United States. They conspired with others who were within the United States to violate the Prohibition and Tariff Acts. In a unanimous opinion, written by Mr. Chief Justice Taft, it was said:

> "The conspiracy was continuously in operation between the defendants in the United States and those on the high seas adjacent thereto, and of the four overt acts committed in pursuance thereof, three were completed and took effect within the United States, and the fourth failed of its effect only by reason of the intervention of the federal officers. In other words, the conspiring was directed to violation of the United States law within the United States, by men within and without it, and everything done was at the procuration and by the agency of each for the other in pursuance of the conspiracy and the intended illegal im-

**178**

portation. In such a case all are guilty of the offense of conspiring to violate the United States law whether they are in or out of the country."

"It will be found among the earlier cases that the principle is sometimes qualified by saying that the person out of the state cannot be held for a crime committed within the state by his procuration, unless it is done by an innocent agent or a mechanical one; but the weight of authority is now against such limitation. Generally the cases show that jurisdiction exists to try one who is a conspirator, whenever the conspiracy is in whole or in part carried on in the country whose laws are conspired against."

"The overt acts charged in the conspiracy to justify indictment under section 37 of the Criminal Code were acts within the jurisdiction of the United States, and the conspiracy charged, although some of the conspirators were corporeally on the high seas, had for its object crime in the United States, and was carried on partly in and partly out of this country, and so was within its jurisdiction under the principles above settled."

Rocha v. United States, supra, reached the same result as to defendants convicted of substantive offenses committed abroad, *independently of any conspiracy*. There, the defendants were charged with knowingly making a false oath before a consular officer abroad and two connected offenses. The Court held that "under 'the protective principle,' less well known than 'the territorial principle,' yet 'claimed by most states,' there is, and should be, jurisdiction. A sovereign

state must be able to protect itself from those who attack its sovereignty".

The Court held further " * * * there are no constitutional provisions which prohibit the exercise of jurisdiction over an alien found within the sovereign's territory, under the protective principle theory. We do not think it necessary to search the Constitution to find specific authorization for such a jurisdiction".

■ We do not ignore contentions of the Appellant that there is no direct proof of knowledge on his part that the suitcase contained smuggled contraband, that an alien corporeally outside the United States cannot be presumed to know the laws of the United States. The intricate scheme devised and directed by this Appellant in such careful detail, so well perfected that it worked once in Chicago although it failed later in Houston, warranted the jury in finding that he was well aware of the laws of the United States against the importation of heroin and that he well knew the contents of the suitcase.

■ Appellant complains of receiving the maximum sentence of twenty years, but this is within the statutory limits, and a sentence within those bounds is uniformly held to be within the discretion of the sentencing court. Further, the District Judge announced in open court that from what he had been presented by the United States Attorney and admitted by the defendant, the defendant had been engaged in the narcotic traffic in and through the United States for more than ten years.

We wish to thank court appointed counsel for his earnest, diligent efforts in behalf of his client.

The judgment of the District Court is affirmed.