Lucien **RIVARD**, Charles Emile Groleau, Julien Gagnon and Joseph Raymond Jones, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 23283.

United States Court of Appeals Fifth Circuit.

April 18, 1967.

C. N. Fansler, Jr., Lawrence A. Mann, Tom N. Goodwin, William C. Wright, Laredo, Tex., for appellant.

James R. Gough, Asst. U. S. Atty., William B. Butler, Asst. U. S. Atty., Woodrow Seals, U. S. Atty., Houston, Tex., for appellee.

Before TUTTLE, Chief Judge, and AINSWORTH and DYER, Circuit Judges.

DYER, Circuit Judge:

The four appellants, Rivard, Groleau, Gagnon (alias Massey) and Jones, all Canadian nationals, were indicted with three other defendants [1] and two co-con-

1. Only one of the other three defendants named in the indictment was arrested. His case was severed from that of appel-lants before trial. See Miller v. Connal-ly, 5 Cir., 1965, 354 F.2d 206. The others are still fugitives.

spirators not named as defendants for conspiracy to smuggle heroin into the United States in violation of 21 U.S.C.A. § 174.[2] Rivard was also indicted for the substantive offense of smuggling and causing to be smuggled seventy-six pounds of heroin into the United States.

Appellants raise three principal questions on this appeal. They challenge the jurisdiction of the District Court; contend that venue was improperly laid in the Southern District of Texas; and complain that there were several conspiracies rather than a single one as alleged in the indictment. We resolve all questions against the appellants and affirm all convictions.

John Michael Caron, a Canadian national named as a co-conspirator but not as a defendant in the indictment, was arrested in Laredo, Texas, in the process of smuggling seventy-six pounds of heroin into the United States from Mexico. He was indicted, arraigned and pleaded guilty to smuggling the heroin. After entering his plea Caron elected to cooperate with the United States authorities. As a result of his testimony before a Grand Jury, appellants were indicted in the Laredo division of the Southern District of Texas, extradited from Canada, and tried and convicted in the Southern District of Texas.

■ Since the jury has returned a verdict of guilty we must view the evidence together with all inferences reasonably and logically deducible therefrom in the light most favorable to the Government. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Cohen v. United States, 5 Cir., 1966, 363 F.2d 321; Ruiz et al. v. United States, 5 Cir., [No. 23,602, 3–24–67]. A rather complete resume of the facts is necessary. At the trial Caron testified that, beginning in the spring of 1963, Massey and Jones shared an apartment in Montreal. The three of them met quite often that spring at a local underworld tavern. At one of these meetings, Massey told Caron, a well-known thief, to prepare to go to France to pick up some narcotics. Groleau met with these three in the apartment and paid Caron to go to Ottawa to get a passport. The plans were changed, however, and Rivard paid Massey and Jones to go to France instead. As Caron put Jones and his wife on board ship, Jones said that Groleau would call Caron soon and that Caron would be making a trip shortly himself.

Weeks later Groleau finally called Caron and told him to go down to the pier in Montreal, greet the returning Massey and drive to North Montreal. Massey, with sixty eight pounds of heroin, followed Caron from the pier to North Montreal where they rendezvoused with Rivard.

A week or so later Rivard sent Caron to Bridgeport, Connecticut, with the heroin where he delivered it to co-defendant Miller, a resident of Connecticut.[3] Massey paid Caron $788 in advance for the trip. A week after Caron had returned to Montreal he went to Massey and Jones' apartment and met with Groleau who asked Caron if he had had a nice trip, instructed him to meet Jones who was now also returning from France and bring him to Groleau at a certain parking lot. As Jones followed Caron from the pier in the car Jones brought back from Europe, his car caught fire. Caron left the burning car and went to the designated parking lot, where Groleau was waiting, and told Groleau of the fire. Groleau contacted Rivard who immediate-

---

**2.** Title 21 U.S.C.A. § 174. "Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *"

**3.** Miller's case was severed and tried separately. See footnote 1.

ly joined them, and the three of them drove back to the burning car and watched the fire department extinguish the blaze. Massey and Jones' wife later joined them there. As the fire burned, Jones told Caron that there was 84 pounds of heroin in the car. The fire did not destroy the heroin and a week later Massey told Caron that Rivard would contact Caron soon about making another trip to Bridgeport to take "the stuff" Jones had brought back from France. After meeting with Rivard and Massey, who told him to proceed the same way he had when taking Massey's load to Bridgeport, Caron left Montreal with his wife and four children and made the delivery in Bridgeport at the same motel to the same co-defendant Miller. Caron returned to Montreal safely, where Rivard paid him $1100 for the trip and selected Caron to make a trip to Mexico.

In October, 1963, after Jones, Massey and Caron had discussed the plans for the three of them to make trips to Europe and Mexico for Rivard in the future, Rivard sent Caron on the fateful trip to Mexico. The night before Caron left, Rivard told Caron to go to El Diplomatico Hotel in Mexico City and call someone named George, who would give Caron the heroin. The next day Rivard gave Caron some tools and tape and showed him how to place the heroin in the car by taking the front seat apart and putting the heroin into the backrest. Rivard then gave him $1500 expenses for the trip and Massey gave him maps.

When Caron reached Mexico City he registered at the hotel and contacted George, but he could not recall the password so George called Rivard in Montreal and put Caron on the line. Satisfied that he had the right man, George loaded Caron's car with the 76 pounds of heroin introduced at the trial and sent him on his way to deliver it in Connecticut at the same Bridgeport motel. Caron was apprehended when crossing the border at Laredo, Texas.

## I. JURISDICTION

■ Under international law a state does not have jurisdiction to enforce a rule of law prescribed by it, unless it had jurisdiction to prescribe the rule. Restatement, Second, Foreign Relations Law of the United States § 7(2).[4]

■ It is for this reason that the mere physical presence of the four alien appellants before the court did not give the District Court jurisdiction. The question remains whether their conduct without the United States had such a deleterious effect within the United States to justify this country in prohibiting the conduct. Restatement, Second, supra § 18.

■ The law of nations permits the exercise of criminal jurisdiction by a nation under five general principles. They are the territorial,[5] national,[6] protective,[7] universality,[8] and passive personality[9] principles. Rocha v. United States, 9 Cir., 1961, 288 F.2d 545; cert. den. 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241; United States v. Rodriquez, D.C., 182 F. Supp. 479, 487, citing Harvard Research on International Law, Part III, Jurisdiction with Respect to Crime, 1935, 29 Am. J. Int'l L. Supp. 435 at 445. All nations utilize the territorial principle, and it is

4. See the case of the S.S. "LOTUS", P.C. I.J., Ser.A, No. 10 (1927), [1927–1928] Ann.Dig. 153 (No. 98), 22 Am.J. Int'l. L. 8 (1928), where a French officer was arrested on Turkish territory. The Permanent Court of International Justice held that the mere physical presence of the defendant within the territory was not sufficient grounds on which to exercise its jurisdiction. The court held that Turkey had no power to enforce its law against the alien, unless it had jurisdiction to prescribe the criminal law with which the alien was charged.

5. Jurisdiction is based on the place where the offense is committed.

6. Jurisdiction is based on the nationality or national character of the offender.

7. Jurisdiction is based on whether the national interest is injured.

8. Custody of the offender gives jurisdiction under this principle.

9. Jurisdiction is based on the nationality or national character of the victim.

under this principle that the District Court had jurisdiction over appellants. There are, however, two views as to the scope of the territorial principle. Under the subjective view, jurisdiction extends over all persons in the state and there violating its laws. Under the objective view, jurisdiction extends over all acts which take effect within the sovereign even though the author is elsewhere. Moore, Report on Extraterritorial Crime and the Cutting Case, U. S. For. Rel. 757, 770 (1887); Berge, Criminal Jurisdiction and the Territorial Principle, 30 Mich.L.Rev. 238 (1931).

### A. As to the Conspiracy

The first question we are called upon to decide is whether the District Court had jurisdiction to try an alien for a conspiracy to commit a crime against the United States, formed without the United States, several of the overt acts having been committed in furtherance of the conspiracy within the United States by a co-conspirator.

■ In Ford v. United States, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927) the Supreme Court clearly put the United States in the camp of those nations adopting the objective view of the territorial principle. In that case the defendants were also Canadian nationals. They were arrested on a British vessel outside the three mile limit of the United States and charged with conspiracy to violate the prohibition and revenue laws of the United States. At all times during the alleged conspiracy they were corporeally outside the United States. Their arrest was upheld on the basis of a treaty, and the Court's jurisdiction to try them for conspiracy was upheld on the basis that overt acts were committed within the United States by co-conspirators and the conspiracy "had for its object crime in the United States, and was carried on partly in and partly out of this

country * * *." 273 U.S. at 624, 47 S.Ct. at 541.

This case presents the same situation. Rivard twice sent co-conspirator Caron across the Canadian border to deliver caches of heroin brought back from Europe by Massey and Jones to another co-conspirator, Miller, in Connecticut. Caron also travelled by automobile from Quebec to Mexico through the United States and was on his way back through the United States with yet another load of heroin to be delivered in Connecticut when he was apprehended in Texas. There is thus no doubt that the object of the conspiracy was to violate the narcotics laws of the United States; that the conspiracy was carried on partly in and partly out of this country; and that overt acts were committed within the United States by co-conspirators. In the words of Mr. Chief Justice Taft:

"* * * The conspiring was directed to violation of the United States law within the United States, by men within and without it, and everything done was at the procuration and by the agency of each for the other in pursuance of the conspiracy and the intended illegal importation. In such a case all are guilty of the offense of conspiring to violate the United States law whether they are in or out of the country." Ford v. United States, 273 U.S. 593, 620, 47 S.Ct. 540.

■ In Marin v. United States, 5 Cir., 1965, 352 F.2d 174 this Circuit relied on the *Ford* case in upholding the District Court's jurisdiction over a Cuban national residing in Mexico indicted for conspiring with others to smuggle heroin into the United States from Mexico. Marin, like appellants here, was never in the United States during the time of the formation or operation of the conspiracy. We conclude that, under the principles of the *Ford* and *Marin* cases, the District Court had jurisdiction over appellants for the conspiracy.[10]

10. Appellants can find no solace in the statement of the Ford court that, "If it were attempted to try the defendants * * * for smuggling of forbidden opi-

um, a different question might possibly be presented." 273 U.S. at 616, 47 S.Ct. at 538. The Court was only pointing out that the defendants and their vessel were

### B. *As to the Substantive Count*

Count two charged Rivard with causing seventy-six pounds of heroin to be brought into the United States.[11] Did the District Court have jurisdiction over Rivard for this substantive offense?[12]

The smuggling of heroin into the United States was the object of the conspiracy. It is inconceivable that the District Court could have jurisdiction over a defendant presently before the court to try him for a conspiracy formed outside the United States, whose object was to smuggle heroin into the United States, but not have jurisdiction to try him for the smuggling itself, which was the very object and fruition of the conspiracy.

■ All the nations of the world recognize "the principle that a man who outside of a country willfully puts in motion a force to take effect in it is answerable at the place where the evil is done * * *." Moore, Report on Extraterritorial Crime and the Cutting Case, 1887 p. 23, U.S. For. Rel., 1887, 757, 771. The United States recognized this principle through Mr. Justice Holmes in Strassheim v. Daily, 1911, 221 U.S. 280, 285,

31 S.Ct. 558, 55 L.Ed. 735, where he said:

"Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power."

When Rivard was extradited to the United States and came within the power of the District Court, he became subject to Holmes' rule.

■■ There is nothing in the objective territorial principle announced in *Strassheim, Ford* and *Marin* which creates a jurisdictional distinction between a substantive offense and a conspiracy. International law did not prohibit the District Court from assuming jurisdiction over all defendants and offenses alleged in this case and the jurisdictional principles of the United States announced in *Strassheim, Ford* and *Marin* permitted the Court to do so. We conclude that, when a substantive offense is committed within the territorial limits of the United States, as the smuggling of the 76 pounds of heroin was here, the Court has jurisdiction over an alien principal[13]

seized and subjected to the jurisdiction of the United States for a conspiracy to smuggle liquor, and that if the United States attempted to try them for an offense other than that for which they were seized, the United States might not have jurisdiction to do so. No such question is involved in this case, for appellants were indicted, extradited and tried for the same crime.

11. Rivard was sentenced to twenty years on each of the conspiracy and substantive charges to be served concurrently, plus fines of $10,000 on each charge. Were it not for the fines it would not be necessary to discuss the District Court's jurisdiction over Rivard for the substantive charge. Mishan v. United States, 5 Cir., 1965, 345 F.2d 790.

12. In their attacks on both the conspiratorial and substantive charges, appellants rely on the holding of United States v. Baker, S.D.N.Y.1955, 136 F.Supp. 546, that the "United States has no power to indict and try an alien for a crime committed abroad." This holding has been specifically disapproved by Rocha v. United States, 9 Cir., 1961, 288 F.2d 545, cert. den. 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed. 2d 1241, where for the first time an American court utilized the protective principle of jurisdiction, see footnote 7, and upheld the District Court's jurisdiction over a substantive crime committed by an alien abroad. The *Rocha* holding thus goes further in giving extraterritorial effect to the law of the United States than this Court need go to uphold the District Court's jurisdiction, for in this case, unlike *Rocha*, overt acts in furtherance of the conspiracy were committed in the United States by co-conspirators.

13. Rivard's acts of counselling, aiding, and abetting Caron in the smuggling of the heroin make Rivard responsible as a principal.

"(a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to

whose participation was all without those territorial limits.

## II. VENUE

■ Appellants' contention that they should not have been tried in the Southern District of Texas but rather in New York, the first district into which they were brought from Canada, borders on frivolity. Venue was properly laid in the Southern District of Texas over all appellants under Title 18 U.S.C.A. § 3237(a) [14] as their offenses were "continued or completed" in the Southern District of Texas. A similar contention by co-conspirator Miller was disposed of by this Court in Miller v. Connally, 5 Cir., 1965, 354 F.2d 206. See also Downing v. United States, 5 Cir., 1965, 348 F.2d 594, cert. den. 382 U.S. 901, 86 S.Ct. 235, 15 L.Ed.2d 155, where this Court held that the District Court for the Western District of Texas had jurisdiction and venue over a defendant who was indicted for conspiracy and substantive counts in the Western District of Texas for a conspiracy formed in Oklahoma with all overt acts occurring in Texas, although the defendant had never been in Texas, nor had he ever communicated with anyone there.

## III. SINGLE CONSPIRACY

■ There is no merit to the contention of appellants Groleau, Jones and Massey that, while they were charged with participation in a single conspiracy to smuggle heroin into the United States, the evidence established only a number of isolated violations of the law, each of which involved Rivard. As the facts outlined above show, "There were several distinct threads running through the actions of the parties * * * and this was sufficient to warrant submission to the jury of the question whether there was a single conspiracy * * *." Green v. United States, 5 Cir., 1964, 332 F.2d 789, cert. den. 379 U.S. 949, 85 S.Ct. 446, 13 L.Ed.2d 546; cf. United States v. Boyance, 3 Cir., 1964, 329 F.2d 372.[15]

The judge emphasized that, to find a defendant guilty he must be found to have been a member of a single conspiracy, and he left this question to the jury under lucid and specific instructions.[16]

We have considered and reject as without merit appellants' remaining contentions.

Affirmed.

be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. As amended Oct. 31, 1951, c. 655, § 17b, 65 Stat. 717." Title 18 U.S.C.A. § 2.

14. "(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offenses was begun, continued, or completed.

"Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves." Title 18 U.S.C.A. § 3237(a).

15. Appellants' reliance on Kotteakos v. United States, 1946, 328 U.S. 750, 66 S.

Ct. 1239, 90 L.Ed. 1557, is misplaced because the first sentence of that opinion shows that the Government admitted that the evidence showed several conspiracies rather than the single conspiracy alleged in the indictment.

16. "Further, I call your attention to the fact that the indictment alleges a single conspiracy to smuggle narcotics into the United States in violation of the United States laws. In order to find each defendant guilty of the offense charged in this first count you must find beyond a reasonable doubt that such defendant was a part of this single overall conspiracy. You will not consider the possibility that some or all of the defendants may have violated the laws of Canada or any other nation except the United States; but, rather, you will confine yourselves to determining whether the evidence establishes the guilt fo each defendant entering into the single conspiracy as alleged in the indictment to smuggle narcotics into the United States of America."