Joseph STASSI, Sr. Appellant,

v.

UNITED STATES of America,
Appellee.

No. 25041.

United States Court of Appeals
Fifth Circuit.

May 6, 1969.

and others whose identity was unknown to the grand jury, to smuggle heroin into the United States, and to facilitate the transportation and concealment of such narcotic drug after it had been brought into this country contrary to law, with knowledge of the illegal importation, in violation of 21 U.S.C.A. § 174. Stassi is the seventh of these named persons to be convicted on account of conduct relating to this conspiracy. Abramson, Hinojosa and Castillo pleaded guilty and accepted their sentences. The convictions of Marin, Granza and Ferrara in trials where they pleaded not guilty have already been affirmed. Marin v. United States, 5 Cir., 352 F.2d 174 (1965); Granza, et al. v. United States, 5 Cir., 377 F.2d 746, 748 (1967). Reference is made to the opinions in those cases for a detailed statement of the facts.[1] The delay in trying Stassi was due to the fact that it took the government over three years to catch him after warrant for his arrest was issued. Moreno and Mondolini are residents of Mexico, and the court below has never acquired jurisdiction over them.

A number of questions are presented by appellant, but the only ones which have enough semblance of merit to warrant discussion are: (1) whether the trial court erred in overruling a motion to suppress evidence as to the fruits of a search claimed to have been illegal; (2) whether a remand is required by Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1962), on account of information furnished this Court by the government during the pendency of this appeal as to certain electronic surveillance.

This case presents the rare situation often talked about, but seldom realized, where the government was able to catch the big shots in a dope ring—a top importer and two big wholesale distributors—as well as those operating on the lower

Percy Foreman, Clyde W. Woody, Marian S. Rosen, C. Anthony Friloux, Jr., Houston, Tex., for petitioner.

William B. Butler, Asst. U. S. Atty., Morton L. Susman, U. S. Atty., Ronald J. Blask, James R. Gough, Asst. U. S. Attys., Houston, Tex., for appellee.

Before TUTTLE and SIMPSON, Circuit Judges, and BREWSTER, District Judge.

BREWSTER, District Judge:

The indictment under which appellant, Joseph Stassi, Sr., was convicted charged that he conspired with Jorge Moreno, Paul Mondolini, Milton Abramson, Anthony Granza, Vincent Ferrara, Jose Marin, Emma Hinojosa, Adela Castillo,

---

1. In the trials of Marin, Granza and Ferrara, as in the present case, the conspiracy and the connection of the defendants therewith were proved primarily by the testimony of one of the other conspirators offered by the government as a witness. Castillo testified in the Marin case, and Abramson, in the Granza and Ferrara case, and in this one.

echelon. It reached the very top, far behind the scenes, when it got Stassi.

The conspiracy contemplated that two residents of Mexico City would have large quantities of almost pure heroin smuggled into the United States in the area of the Lower Rio Grande Valley in Texas to be taken to the front man of the purchaser who resided in New York City. A suitcase filled with plastic packets of heroin would be turned over to the exporters' courier at McAllen, Texas to be transported to the place in the United States agreed upon for delivery. The couriers were Mexican women who lived in Mexico. They did not know the names of any of the conspirators except that of the man who employed them. When the courier received a suitcase of heroin, she was given a set of written instructions, telling her when, where and how to go, the hotel where she was to stay, the name to use on the trip, and the manner in which the intended recipient would contact her at the hotel. For security reasons, the same courier was not used every time, and a different hotel was selected for each one of the six deliveries known to the government at the time of the trial. Two hotels were designated for deliveries in New York, and one each in Newark, Chicago, San Antonio and Houston. The courier checked out of the hotel and left immediately after meeting with the importer's front man. On several of the trips, the exporters had a man "ride shotgun", as one of the conspirators termed it, on the shipment while it was in transit in this country. Without the knowledge of the courier, he would shadow the suitcase of dope en route from the time she took possession of it until she had it in her room at the destination hotel. The purpose was to be able to report to the recipient front man any search or suspected surveillance on the trip, so that if there had been any, the front man would not attempt to contact the courier. In the instances when that practice was followed, the intended recipient did not call the courier until he had had a telephone call from the gumshoer that everything was all right. For some reason not explained in the record, no such observer followed the last shipment, and that carelessness led to the downfall of this ring of dope smugglers.

The narcotic wholesalers in this country who were purchasing the heroin from the importer were always in or near the hotel to take the suitcase of contraband off the hands of the front man without delay. They would later deliver the purchase money to him in currency at the hotel in New York where he was residing. The front man would take his cut and deliver the balance to the importer in New York, who, in turn, would fly to Mexico City via commercial airline to pay what was owing the exporters on the shipment.

Moreno and Mondolini of Mexico City were the exporters and Marin was their field man in Mexico. Hinojosa and Castillo of Monterrey, Mexico were the couriers who were hired by Marin. Stassi of New York City was the importer, and Abramson, also of New York City, was his front man working on a partnership basis. Granza and Ferrara were the wholesalers who were buying from Stassi each entire shipment smuggled in to him. Although Marin was residing in Mexico during the period of the conspiracy, he was a Cuban national; and Mexico deported him when it learned of his connection with the smuggling operation. He came to the United States, apparently thinking he could not be tried here because he was corporeally outside the United States during the period of the conspiracy. This Court rejected that contention on his appeal. Marin v. United States, *supra*.

There is no question that this conspiracy was a big time operation involving some real underworld characters. The six shipments known to the government when Stassi was tried involved a total of more than one hundred pounds of the contraband, not the Mexican type of the drug that is radically "cut" with powdered sugar or other substances before crossing the border, but amost pure

heroin. The sixth shipment, consisting of 22 pounds, 12 ounces, was the only one seized by the officials, as the other five had taken place before the government learned of the smuggling. That shipment was also involved in the trials of Marin, Granza and Ferrara. This Court said of it in the Marin case, 352 F.2d at 177: "The suitcase contained about 22 pounds of 99.3% pure heroin of an ultimate value of eleven million dollars." The payments by Granza and Ferrara for each of these shipments they bought from Stassi were so bulky that the currency had to be carried in large grocery sacks and big shoe boxes. Abramson had two prior narcotics convictions, one of which was for smuggling opium into the United States. The opinion in the Marin case mentions that Marin had been engaged in the narcotic traffic in and through the United States for more than ten years. Stassi had been a professional gambler and was the owner of one of the large gambling casinos in Havana at the time Castro closed them down.[2] The stature of Stassi, Granza and Ferrara in the underworld is revealed by the fact that all of these large shipments of heroin were delivered to them entirely on credit, something that is practically unheard of in the narcotics racket.

One of appellant's contentions is that the trial court erred in overruling his motion to suppress a search and seizure at the bus depot in McAllen, Texas of the

suitcase containing the sixth and last shipment of heroin above mentioned. That motion was heard out of the presence of the jury at the first trial of appellant in Corpus Christi, Texas, which resulted in a verdict of guilty that was set aside on account of misconduct of the jury. It was renewed before a different judge in the subsequent trial in Houston out of which this appeal grew. Each judge overruled the motion and admitted into evidence testimony pertaining to, and the fruits of, the search. A summary of the facts relating to that shipment and the actions of the officials in regard thereto follows.

Mr. Scott was the Agent in Charge at the U.S. Customs office in McAllen, a city in the Lower Rio Grande Valley of Texas. Agents Kline and Bobo worked under him there. On November 2, 1962, Agent Scott received a call from a person not identified at the trial telling him that a shipment of heroin would be smuggled into the United States from Mexico within a few days, and that he would call Scott when it happened. On November 6th, Kline was in the customs office when Scott received another call from the informant stating that a woman of Latin American extraction, wearing a red checked dress and carrying a black coat and a black handbag, had just purchased a ticket to Houston at the McAllen bus station and had there checked a blue suitcase containing about twenty-five pounds of heroin.[3] Scott

---

2. Stassi's defensive theory was that he was the owner and operator of the Sans Souci gambling casino in the National Hotel in Havana at the time Castro took over; that he left Cuba when Castro closed professional gambling there; and that he made the numerous trips to Mexico proved by the government looking for legitimate investments. His counsel related that theory to the jury on voir dire examination, and also went into it with a defense witness. Stassi did not testify, and there was no explanation for his use of a number of aliases in getting plane tickets and in registering at hotels in Mexico, if the object of the trips was legitimate.

3. This information is as specific as that in Thomas v. United States, 5 Cir., 372 F.2d 252, 253 (1967), and Juarez-Flores v. United States, 5 Cir., 394 F.2d 161 (1968), which was held to be adequate to support searches and seizures by customs agents in those cases.

  The information in the *Thomas* case appears in the following quotation from footnote 1: "The informer described a Negro male about 5'6" in height, medium build, with a mustache, wearing a green shirt, a small beany-type cap, and dark trousers."

  In the Juarez-Flores case, the customs agents were informed that a shipment of marihuana would be made within a

told Kline of the information he had received and requested that Kline accompany him to the bus station. Agent Bobo, also acquainted with the developments, picked up a local state narcotics officer and met them there. Ramirez, the ticket agent at the station, knew the customs agents from their prior surveillances. Scott and Kline related to Ramirez the description of the woman given by the informant, and found out from him that a short time before a woman fitting that description had bought a bus ticket to Houston and checked a blue suitcase for the trip. Ramirez told them that he understood the woman had gone shopping, and pointed out her blue suitcase in the area reserved for baggage to be loaded on buses. Scott and Kline found that it bore a baggage check on the outside indicating it was en route from McAllen to Houston, and that it was locked. The suitcase was removed to a more private area of the station, and Kline opened it with a key from a master set which was part of the equipment of his office. Inside the suitcase, they found some styrofoam blocks and a brown zippered bag containing twenty plastic or glassine packets filled with a white powder. The styrofoam blocks were apparently for the purpose of preventing the brown bag from shifting around. One plastic bag was kept and the others were put back in the suitcase, which in turn was locked and returned to its original location in the station. Ramirez and Scott were present during all of the time Kline was examining the suitcase and its contents. The suitcase was under constant, close surveillance by customs agents and other officers acting in concert with them from that time until Abramson was arrested at the Texas State Hotel in Houston on the following morning. The

suitcase, with all its contents, weighed about twenty-five pounds. A Marquis Reagent test of the contents of the one plastic bag kept out of the suitcase, made at the McAllen customs office before the bus left for Houston, showed that the substance was heroin.

The search of the suitcase took place about 4:45 P.M., and Kline never left the station until he boarded the bus for Houston at 7:00 P.M. During the interval between the search and bus departure, a woman fitting the description theretofore given by the informant came into the waiting room and remained there until she got on the Houston bound bus. Kline purchased a ticket to Houston; and after seeing the blue suitcase put into the baggage compartment of the bus, he boarded and managed to get a seat directly over the compartment where he could watch any handling of the baggage and observe the woman while she was on or around the bus.

The agents of the customs office at McAllen notified state narcotics officers at Corpus Christi of the situation, and requested that they be present to help in the surveillance during the bus stop there. They also notified the customs office at Houston, and requested that its agents be at the bus station at arrival time the next morning with enough help from the narcotics officers of the local police department to carry out any surveillance which might become necessary when the woman left the station there. Some of the customs agents from the McAllen office, along with other officers solicited by them, closely followed the bus in automobiles on its entire trip from McAllen to Houston.

The bus arrived in Houston at about 6:25 A.M. on November 7th. The blue suitcase was unloaded and the woman

week from El Paso to New York City by bus; that it would be in one or more large metal suitcases of a certain description; that the person bringing the suitcases to the bus station would be either a large, strong Mexican man or a smaller Mexican man. The customs agents set up a surveillance at the bus

depot. Four days later, Juarez-Flores, a large, strong Mexican man brought two big metal suitcases into the depot and turned them over to the bus agent for shipment by express. The shipping tags showed they were destined for New York City.

under suspicion claimed it. Kline followed a man who had visited with the woman on the bus. It soon developed that he was not involved with the heroin. Surveillance of the woman was taken up by the customs agents and local police officers who were waiting at and around the station when the bus arrived. They followed a cab containing the woman to the Texas State Hotel, and arrested her as she entered the hotel carrying the suitcase at about 7:00 A.M. She and the suitcase were taken to the downtown customs office in Houston. The woman courier was Adela Castillo, one of the persons named as a conspirator in the indictments growing out of this smuggling operation. Shortly after she got to the customs office, she agreed to cooperate with the customs agents in trying to learn the identity of the person who was to receive the suitcase of heroin from her.

Under the close supervision of the customs agents, Mrs. Castillo returned to the Texas State Hotel with the suitcase and registered as if she had arrived without interruption. The agents made arrangements with the hotel to have a room with a connecting door to hers. Kline and another customs agent were in the room with her at all times she was there. Other agents were in the adjoining room with the connecting door open. Cooperating officers were maintaining surveillance in the lobby and on the outside of the hotel.

Around midmorning, Mrs. Castillo received the expected telephone call from a man asking her to meet him downstairs. Kline followed her to the lobby where she met the man later identified as Abramson. After a visit with Abramson in the coffee shop, she returned to her room to get the suitcase of heroin. When she got back to the lobby, she went to the cashier and checked out. She went to a cab at the hotel entrance, with a bell boy carrying the suitcase. Abramson, who had been waiting in the lobby, joined her as she left the hotel. The

bell boy delivered the suitcase to the cab driver, who put it in the trunk of his vehicle, and Mrs. Castillo got in the cab. Customs agents and officers working with them approached and arrested Abramson as he was in the act of entering the cab. They took Abramson, Mrs. Castillo and the suitcase to the Houston customs office.

The custody of the suitcase and its contents were properly accounted for from that time until they were offered in evidence at this trial. Expert chemical analysis revealed that the powder in each of the plastic packets in the suitcase was 99.3% heroin.

No warrant of any kind was obtained prior to the time that Abramson was taken to the customs office.

The trial court overruled the motion to suppress on the grounds that the search was valid as a "border search" and that, in any event, the appellant had no legal standing to question it.

The border search theory is supported by 19 U.S.C.A. § 482; Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); King v. United States, 5 Cir., 258 F.2d 754 (1958); Mansfield v. United States, 5 Cir., 308 F.2d 221 (1962); Romero v. United States, 5 Cir., 318 F.2d 530 (1963); Marsh v. United States, 5 Cir., 344 F.2d 317 (1965); Valadez v. United States, 5 Cir., 358 F.2d 721 (1966); Thomas v. United States, 5 Cir., 372 F.2d 252 (1967); Morales v. United States, 5 Cir., 378 F.2d 187 (1967); Juarez-Flores v. United States, 7 Cir., 394 F.2d 161 (1968); Walker v. United States, 5 Cir., 404 F.2d 900 (1968); and Alexander v. United States, 9 Cir., 362 F.2d 379 (1966), which is quoted from with approval in the *Marsh* and *Morales* cases. Proof of reliability of the informant[4] and of probable cause was not required to establish the validity of this border search. It was necessary only that the customs agents had reasonable cause to *suspect*[5] that the suitcase contained

---

4. Valadez v. United States, 5 Cir., 358 F.2d 721 (1966).

5. 19 U.S.C.A. § 482.

heroin which had been smuggled into this country, and that their conduct in connection with the search and seizure was reasonable. McAllen is only about ten miles from the Mexican border. The information the customs agents had and common knowledge of daily smuggling of large quantities of narcotics into the United States from Mexico [6] gave them reasonable cause to suspect that the suitcase in question contained heroin which had been brought into the United States contrary to law. The conduct of the customs agents in making the search and seizure at the McAllen bus depot, as well as the subsequent conduct of such agents and other officers working with them, was reasonable.[7] The work of the officers in solving the difficult situation involved in this case is to be commended rather than condemned.

■■ The trial court's theory that the appellant had no standing to question the validity of the search is sustained by the holding of this Court in Granza, et al. v. United States, *supra.* In that case, Granza and Ferrara challenged the legality of this search and seizure at the McAllen bus depot. They were convicted in a joint trial under the identical indictment on which appellant was later convicted. The government's proof in their case was substantially the same as it was in the trial of appellant. The standing of appellant to suppress evidence obtained by the search is no better than theirs was. Everything that was said in the opinion in that case as to why they were not persons aggrieved by the search is equally applicable to the appellant. The elements necessary to bring this case within the rule announced in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and Henzel v. United States, 5 Cir., 296 F.2d 650 (1961), are totally lacking. The object of the search was a suitcase in the possession of the Mexican exporters' courier, committed to the custody of a common carrier for transit, located in the baggage section of a bus station over three hundred miles from the place where it was to be delivered to appellant through his front man. The appellant claimed no interest in the suitcase or its contents, or in the premises on which the search was conducted. He was nowhere in the vicinity when it took place. It was months after the search before the government learned that appellant had any connection with any phase of this smuggling operation.[8] Proof of possession of this heroin alone would not have been enough to make out the offense charged. The case against appellant was established by the detailed testimony of his co-conspirator, Abramson, strongly corroborated by documents and other evidence. The appellant's privacy was in no way invaded by the search. The fact that he claims prejudice through the use of evidence gathered as a consequence of a search or seizure directed at someone else is not enough to make him a person aggrieved by the search. Jones v. United States, supra. See also Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Bullock v. United States, 5 Cir., 368 F.2d 483 (1966);

6. Thomas v. United States, supra, at p. 254, footnote 4.

7. Knowledge of the agents stemming from the legal search at the McAllen bus depot can be considered in judging the reasonableness of their subsequent conduct. Romero v. United States, 5 Cir., 318 F.2d 530, 532 (1963). The officers involved were working in close concert with each other, and the knowledge of one of them was the knowledge of all. United States v. Romero, 2 Cir., 249 F.2d 371, 374 (1957).

8. Stassi, Granza and Ferrara were not named in the first indictment growing out of this conspiracy. They were too far in the background to be known at that time. The government first learned of their connection with this smuggling operation several months after this search, when Abramson decided, after beginning the service of his sentence, that Stassi had let him down by not furnishing any aid in his defense. Abramson first gave the goods on Stassi, and later decided to tell the government about the connection of Granza and Ferrara. Warrant for Stassi was first issued on March 14, 1963, over four months after the search in question on November 6, 1962.

United States v. Konigsberg, 3 Cir., 336 F.2d 844, 847 (1964); Diaz-Rosendo v. United States, 9 Cir., 357 F.2d 124 (1966), cert. den. 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83; Rule 41(e), F.R.Crim.P.

We have carefully examined all other questions raised by appellant relating to matters arising during the trial, and have concluded that they do not have enough merit to warrant discussion. None of them presents error.

There is a question, however, not based on anything that occurred during the trial, which requires a remand for limited purposes. After the submission of the case here, the government filed a document styled, "Memorandum for the United States", which states that pursuant to the opinion in Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968), it is tendering to this Court, to be opened only by it, a sealed envelope for each judge on the panel containing the transcripts of two conversations overheard by means of electronic surveillance authorized by the Department of Justice. The memorandum asserts that such electronic surveillance was directed at persons other than the appellant on premises not owned by him; that appellant was never the direct subject of this or any other electronic surveillance; but that one of the participants in the conversation was a person using the name, "Joe Rogers", which was one of appellant's aliases, and that such person was "apparently" the appellant. The government claims in said memorandum that: "The contents of the monitored conversations are clearly unrelated to this case, were never used in this case, and never formed the basis of leads to any evidence in this case." The appellant contends that the information so furnished entitles him to a remand for further investigative proceedings in the district court in regard to electronic surveillance which he might have the standing to question.

Similar action in regard to electronic surveillance has been taken by the government in a number of other cases pending on appeal, and the recent decisions of the Supreme Court in some of them have now settled the procedure to be followed. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969); Stassi v. United States, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969). This case is therefore remanded to the trial court for the limited purpose of further proceedings in conformity with such decisions in regard to electronic surveillance material to this case.

Remanded.