441 F.2d 175
 UNITED STATES of America, Plaintiff-Appellee,
v.
Rene Juarez LEON, Martin Francis Xavier Casey, Lawrence
James Carlin, Howard Kenneth Davis, Ralph Grant
Edens, Charles Smith and Edmund Kolby,
Defendants-Appellants.
 No. 29459.
 United States Court of Appeals, Fifth Circuit.
 March 30, 1971.
 
 Lawrence S. Katz, Ct. appointed, Miami Beach, Fla., for Casey & Smith. Harvey S. Swickle, Jack R. Nageley Law Offices, Miami Beach, Fla., for defendants-appellants.
 Robert W. Rust, U.S. Atty., Lloyd G. Bates, Jr., Charles O. Farrar, Jr., Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.
 Before TUTTLE, AINSWORTH and SIMPSON, Circuit Judges.
 AINSWORTH, Circuit Judge:
 
 
 1
 This bizarre criminal case involves an ill-fated expedition, by a small group of men, defendants herein, to overthrow the government of the Republic of Haiti. Appellants, Rene Juarez Leon, Martin Francis Xavier Casey, Lawrence James Carlin, Howard Kenneth Davis, Relph Edens, Charles Smith and Edmund Kolby, appeal from a judgment of conviction for violation of 18 U.S.C. 371, relative to conspiracy to commit an offense against the United States, by organizing a military expedition against the Republic of Haiti, a foreign state, with which the United States is at peace, as proscribed by 18 U.S.C. 960.
 
 
 2
 The attempted invasion and all pertinent events leading thereto occurred in 1969. In February of that year, Andrew Terracino, owner of a 65-foot vessel, was contacted in Key West, Florida, by appellants Davis and Carlin, who wanted to charter the vessel for March of April. Davis and Carlin told Terracino that they represented the Air-Sea Rescue Operation. Terracino later visited the Air-Sea Rescue Operation office in Miami, where he saw three additional appellants-- Kolby, Edens and Smith. In May, appellants Davis, Carlin and Leon met with Terracino for further charter boat negotiations. It was about this time that Terracino learned from appellant Davis of a plan to use the vessel in an invasion of Haiti. On May 16, a bareboat charter was executed between Terracino and appellant Edens, acting under the name of Evans, in behalf of Air-Sea Land Rescue and Survival Specialists. Shortly thereafter the charter was cancelled presumably because of information that Dr. 'Papa Doc' Duvalier, president of Haiti, had had a heart attack.
 
 
 3
 The next phase of events pertaining to the conspiracy occurred in March. Alceo Vidal, a member of the Monroe County, Florida, Sheriff's Department, was directed to investigate a shooting accident in the Florida Everglades. En route to the area he met appellant Edens, who was dressed in combat, fatigue-type Clothing and carried a pistol at his side. Edens told Vidal that he and a group of men had been engaging in guerilla-type tactics in a wooded area when one of the group was accidentally shot. Appellant Kolby and others had taken the victim to a hospital where he subsequently died. Sheriff Vidal and Edens proceeded into the wooded area to the training camp area. Nine individuals, dressed in fatigue-type military clothing with .22-calibre pistols, reenacted the accident. The participants then came out of the swamp on to the road where they turned over sixteen weapons to Vidal, who marked them. Appellant Casey requested Vidal not to photograph the men for the sake of their respective families. Several days later Vidal observed appellant Smith in the training camp area. A cornor's inquest inquiring into the accidental shooting resulted in the release of everyone involved. Subsequently Sheriff Vidal returned the weapons to appellant Casey, at which time Casey told Vidal that there was a force of men, including those involved in the shooting accident, who were being trained to overthrow 'Papa Doc' Duvalier, president of Haiti.
 
 
 4
 A third series of events, which culminated in the arrest of appellants on June 6, began some time in May when an aircraft mechanic, Marvin Simpson, was approached by appellant Carline at Miami International Airport in connection with maintenance work for the Air-Sea Rescue Operation. Simpson next heard from appellant Carlin on June 1 when Carlin telephoned and asked him to go to Fort Lauderdale to help prepare a plane for flight on the following day. Appellants Carlin and Davis picked up Simpson the next day, June 2, and the three of them then rode to the Miami International Airport where they met with William Dernbach, a flight engineer, with whom Carlin had also made arrangements the prior day. Dernbach accompanied them to a junk yard where appellants Carlin and Davis looked at some metal drums. They then drove to Fort Lauderdale where Simpson and Dernbach conducted a pre-flight check of an airplane at an airfield there. The plane, a Lockheed Constellation, had distinctive markings. Simpson, Dernbach and Carlin ferried the plane to Miami. That night appellants Davis and Carlin, accompanied by Simpson, picked up about fifty 32-gallon metal drums and placed them aboard the aircraft. Later Simpson assisted appellant Davis and others in placing some type of inflammable jet fuel in the drums. At about 10 a.m. the following day, June 3, Simpson, Dernbach and appellants Carlin and Davis departed from Miami in the Constellation and proceeded to South Caicos in the Bahamas, where appellants Leon, Kolby, Smith, Edens and Casey were taken aboard. Also loaded aboard were heavy boxes. At some time after 8 p.m. the group departed from Caicos. Early the next morning, June 4, a landing was made at Georgetown, Exuma, where the aircraft was refueled. They departed from Georgetown about 9 a.m. During the entire flight appellant Carlin acted as pilot; appellant Davis, as co-pilot; Dernbach, as flight engineer; and Simpson, as mechanic. Shortly after leaving Georgetown, the occupants of the plane's cabin changed into military, fatigue-type clothing and armed themselves with rifles, pistols and other weapons. Under the direction of appellant Davis, the occupants began attaching flares to the metal drums to be used as detonators. Shortly thereafter Carlin introduced Leon to Dernbach as Colonel Leon, 'the next President of Haiti.' Several minutes later, as the plane passed over the coastline of Haiti, Leon Directed Carlin to fly over the Palace in Port-au-Prince. At about 500 feet altitude appellant Davis, in the cockpit, gave instructions to 'get ready,' followed by a signal to drop the drums. Four of the drums were then pushed through the open cabin door. The plane circled, and drums were again dropped. The plane was struck several times by ground gunfire, one shell causing a fire in the cockpit. The plane then started to climb up and out of the area and Leon directed that they land at Cape Haitian. This plan was changed, however, as there appeared to be ground resistance and the supply of prepared drums was exhausted. The aircraft turned instead in the direction of Miami. Appellants Davis and Carlin discussed plans to land on an island in the Bahamas. The island could not be located. After several hours in the air the fuel was running very low and the plane began drifting dangerously. About the time that the crew prepared to ditch the craft in the ocean, a small auxiliary United States Air Force Trancking Station near Freeport in the Bahamas made contact with the crew for the plane to land at that point. The Base Commander, a Major William Harrison, later boarded the plane and questioned the crew. No fuel was available at the base, so appellants proceeded by ground transportation to Freeport to secure fuel for another takeoff. Back at the military basethe bullet holes in the fusilage of the plane were discovered. The Freeport police were immediately contacted, who met appellants en route to Freeport and detained them there at the police station for two days. On June 6 they were flown back to Miami and arrested by U.S. Customs Agents. On that same day, under Major Harrison's instructions, the rear luggage compartment of the plane was searched. Various items including a quantity of weapons were removed therefrom. Some of the weapons were those obtained and marked by Sheriff Vidal in the Florida Everglades on March 11. A flag marked 'Brigade-Gerald Baker' was also removed from the plane. Gerald Baker was the name of the unfortunate victim in the shooting accident at the guerrilla camp in the Everglades.
 
 
 5
 Appellants raise numerous issues on appeal. The basic theory which underlies these issues is that neither the alleged conspiracy nor any overt act in furtherance thereof occurred in the United States, or that if such a conspiracy existed it was abandoned and a new conspiracy was formulated beyond the territorial limits of the United States. Appellants minimize the activities shown by the evidence to have occurred in Florida as acts purely innocent in nature. Without abandoning any of these contentions, appellants particularly emphasize the two following alleged errors of the Court:
 
 
 6
 First, the Court erred in denying defendants' request for permission to perpetuate testimony by deposition of a witness residing outside of the territorial limits of the United States. Appellants contend that the testimony of John Wankyn, a resident of Nassau, would have shown that he had requested the fuel oil from the United States to be used by him in connection with his construction business. The motion to perpetuate testimony of Wankyn was made on the second day of the trial following the testimony of Terracino relating to various activities of some of the co-conspiratiors in connection with the attempted bareboat charter. The Court, in denying the motion, cited as one of its reasons the holding in Rivard v. United States, 5 Cir., 1967, 375 F.2d 882, to the effect that a federal court has jurisdiction to try aliens for a conspiracy formed outside of the United States where several of the overt acts in furtherance of the conspiracy were committed within the United States by a co-conspirator. In our opinion, the Court correctly denied the motion on the basis of Rivard and other stated reasons. The motion to take a deposition was not made until the second day of trial. The motion was without merit in view of the overwhelming evidence showing the existence of a conspiracy formulated in the United States and the numerous overt acts committed in Florida in furtherance of that conspiracy.
 
 
 7
 Secondly, appellants contend that the lower court erred in admitting into evidence items that were seized from the aircraft on the United States auxiliary airfield without a search warrant or probable cause. The evidence shows that the airplane landed at the United States military base in the Bahamas with the permission of the Base Commander, Major Harrison. It was under his direction that the Bahamian officials were allowed to examine the plane. The Court denied the prior motion to suppress the evidence seized from the aircraft. We find no denial of any Fourth Amendment rights of appellants. The search was conducted in accordance with military law. As said in United States v. Grisby, 4 Cir., 1964, 335 F.2d 652, 655: 'In many contexts, the exercise of military disciplinary authority, including the conduct of searches, could not be made dependent upon the issuance of valid civilian process if effective military controls are not to be gravely impaired.' This is particularly true where, as here, the bullet-ridden fusilage of the plane furnished probable cause for a search. Furthermore, in view of the abundant independent evidence establishing a continuing conspiracy to overthrow the military regime in Haiti, the guerilla training tactics in the Everglades, the negotiations first for a vessel and then an airplane to accomplish appellants' objectives, any evidence admitted, if erroneous, was so 'unimportant and insignificant' that it may be deemed harmless. Chapman v. State of California, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).
 
 
 8
 Appellants additionally contend that the District Judge erred when he informed the prosecution that if the seven defendants sought to introduce evidence tending to negate intent, the Government would be permitted on rebuttal to introduce evidence of prior convictions of two defendants for the same offense.
 
 
 9
 No reason is shown why the five appellants who did not have former criminal records failed to testify. They elected not to, and apparently their trial strategy failed. The Court correctly announced its intention to allow the Government to introduce evidence of prior convictions for the same type of offense of two of the defendants if they took the stand. The evidence would have been admissible under several theories-- for impeachment purposes, on the issue of intent and to show a pattern of conduct. Gilstrap v. United States, 5 Cir., 1968, 389 F.2d 6, cert. denied, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652; United States v. Chapman, 5 Cir., 1969, 413 F.2d 440, cert. denied, 396 U.S. 903, 90 S.Ct. 217, 24 L.Ed.2d 180; Weiss v. United States, 5 Cir., 1941, 122 F.2d 675, cert. denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550.
 
 
 10
 Appellants raise other specific points of error, all of which have received our careful consideration. For example, they contend that the Court erred in charging the principles of our holding in Rivard relating to extra-territorial criminal jurisdiction; also to their motion to dismiss the indictment based on alleged denial of Sixth Amendment rights to compulsory process of witnesses; to the alleged failure to give Miranda (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) warnings in connection with the statements of some of the defendants to Sheriff Vidal of their intention to overthrow the Haitian government. Suffice it to say we have considered all of these contentions very carefully and find them to be completely without merit. In our view the rulings of the District Court in regard to these matters were proper under the law and should be sustained.
 
 
 11
 Affirmed.