**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Aston WINTER, Howard Charles Towne, Stanton Davis and William Michael Parks, Defendants-Appellants.**

No. 73–2236.

United States Court of Appeals,
Fifth Circuit.

March 13, 1975.

2. 390 F.Supp. 637 (S.D.Ga.1974).

Robert W. Rust, U. S. Atty., Jerome B. Ullman, Jr., Don R. Boswell, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Jack V. Eskenazi, Federal Public Defender, Michael Doddo, Asst. Federal Public Defender, Miami, Fla. (Court-appointed not under ACT), for Winter.

David B. Javits, Max P. Engel, Miami, Fla., for Towne.

George D. Gold, Miami, Fla. (Court-appointed), for Davis.

Melvyn Kessler, Miami, Fla., for Parks.

Before BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

On March 8, 1973, at a point on the high seas approximately 35 miles from the coast of Florida and 11.9 miles from the nearest island of the Bahamas,[1] United States Coast Guard officers boarded the American owned M/V Big L which at the time was being towed by the American owned M/V Adventurer III and promptly located over a half a ton of marijuana which they knew to be aboard. The four members of the M/V Big L's crew, appellants Winter and Davis (both Jamaican nationals), appellant Towne (an American citizen) and co-defendant Saunders[2] (a Bahamian national) were immediately arrested and brought into the Southern District of Florida. Appellant Parks (an American citizen) was arrested the following morning when he was found concealed aboard M/V Adventurer III in Miami.

Appellants entered pleas of *nolo contendere* to an indictment pursuant to 21 U.S.C.A. §§ 952(a)[3] and 963[4] charging them with conspiring to import 1,130 pounds of marijuana, a schedule I controlled substance, into the United States.[5]

1. The distances were a matter of stipulation in the District Court.

2. Saunders entered a plea of *nolo contendere*, received a sentence of 18 months imprisonment and chose not to appeal.

3. § 952.
   (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcot-

ic drug in schedule III, IV, or V of subchapter I of this chapter.

4. § 963. *Attempt and conspiracy*
   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

5. A. J. Moreno, who allegedly helped put the load together in Jamaica, was also indicted but has never been arrested.

978

■ Appellants are before us challenging alleged defects in the trial court's jurisdiction over their persons and over the crime.[6] Through separate briefs and oral argument, appellants raise a variety of theories each incorporated by reference by the rest.[7]

Essentially, however, the following challenges of significance are presented.

(1) Were the Jamaican nationals, Winter and Davis, charged with a crime over which the District Court had jurisdiction assuming that they were arrested beyond the territory of the United States, were not alleged to have been within the United States during the pendency of the conspiracy and all the overt acts alleged in the indictment related solely to the conduct within the United States of appellant Parks, an American citizen?

(2) May either the Jamaican appellants or the Americans challenge the District Court's jurisdiction over their persons on the ground that they were unlawfully brought within the Court's territorial jurisdiction following an illegal arrest by the Coast Guard?

(3) Were any of the appellants, most particularly Parks, misled into believing that they would be permitted to appeal non-jurisdictional aspects of the District Court's denial of the motion to suppress in contradiction to our decisions in United States v. Sepe, 5 Cir., 1973, 486 F.2d 1044 (en banc) affirming 474 F.2d 784; United States v. Mizell, 5 Cir., 1973, 488 F.2d 97?[8]

After indictment, appellants entered pleas of not guilty and moved to dismiss the indictment for a lack of jurisdiction over their persons and the crime and to suppress the contraband seized aboard M/V Big L. The facts we set out were adduced by stipulation and testimony at the hearings before the District Court on the motions to dismiss for want of jurisdiction and to suppress and upon the entry of the pleas.

### Smuggling By The High Seas

On January 3, 1973 an individual named "Dave" and Michael Force (aka Michael Parks) approached Roy Warren in Miami and offered to pay him $15,000.00, $2,500.00 in advance, for the use of his boat M/V Adventurer III to import a load of marijuana into the United States from Jamaica. Shortly thereafter, Warren contacted the Bureau of Narcotics and Dangerous Drugs (BNDD) and informed them of the offer. The BNDD advised Warren to cooperate, assisted him in making necessary alterations[9] to his boat and provided him with certain navigational equipment required by the enterprise. Not content with assisting in the role of one who victuals and supplies, the Government engaged in man-

6. These appeals are necessarily limited to attacks on jurisdictional defects in light of our recent decisions in United States v. Sepe, 5 Cir., 1973, 486 F.2d 1044 (en banc) affirming 474 F.2d 784; and United States v. Mizell, 5 Cir., 1973, 488 F.2d 97. See note 8, infra.

7. While each appellant incorporates all the helpful theories of his co-appellants as a matter of course, differences in factual circumstances such as nationality or situs of arrest occasionally call for separate treatment which we indicate.

8. In Sepe we held that after entering a plea of nolo contendere or a plea of guilty, a defendant may only appeal jurisdictional defects in the proceeding below, such as the failure of the indictment to state a crime, the unconstitutionality of the statute underlying the indictment, the expiration of the statute of limitations or necessarily the District Court's lack of jurisdiction over the subject matter or the

persons of the defendants. Furthermore, we disapproved the practice whereby a District Court accepted a plea sanctioning an agreement between prosecution and defense under which the defendant would be allowed to raise non-jurisdictional defects on appeal. In Mizell we vacated and remanded with orders to allow the defendant to determine whether to replead, in view of the presence of the type of agreement disapproved in Sepe. See also United States v. Mendoza, 5 Cir., 1974, 491 F.2d 534; Haynes v. United States, 5 Cir., 1967, 372 F.2d 651 reversed on other grounds, 1968, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923; United States v. Cash, 5 Cir., 1973, 486 F.2d 295.

9. The alterations were financed by the advance payment. The BNDD provided Warren with $500.00 to cover the expenses of the trip to Jamaica.

ning, *cf.* 46 U.S.C.A. § 186, by supplying two BNDD undercover agents to accompany Warren on the voyage as members of the crew.

### The Scene Shifts To Land

Once in Jamaica, Warren met Parks and accompanied him into the hills where he was introduced to a number of Jamaicans, including an individual known as "Louis" (aka Stanton Davis), who was allegedly involved in "putting the load together." During the course of the enterprise, Warren kept in close contact with supervisory officials of the BNDD. Warren relayed the message that the boat was loaded and ready to go.[10]

### Back To The High Seas

On Monday, March 5, BNDD agent Cooke received another call from Warren from Grand Cayman in the Bahamas, informing him that they were proceeding with one and one-half to two tons of marijuana on board as well as with "Louis" and another Jamaican who were returning with them to the United States.[11] Warren further informed Cooke that after refueling on Wednesday or Thursday, M/V Adventurer III would rendezvous at dusk with a 38 foot fishing vessel from Ft. Lauderdale called M/V Big L in the vicinity of Riding Rocks[12] and that the marijuana would be transferred to that vessel.[13]

### Seagoing Surveillance And Boarding

From time to time on the 7th and the 8th, the BNDD maintained aerial surveillance of both vessels while they were tracked by radar from C/G cutter Dauntless. Between 7:30 and 9:30 on the 8th, Warren informed the BNDD agents aboard C/G Dauntless by radio that the contraband and the two Jamaicans had been transferred to M/V Big L. Approximately 30 minutes later, Warren radioed that M/V Big L had developed engine trouble and had been taken under tow by M/V Adventurer III.

Shortly thereafter the C/G Dauntless accosted the vessels. By stipulation, the position of the vessels at the time of the encounter was 35 miles from the closest point on the Florida coast and 11.9 miles from North Cat Cay, the closest point in the Bahamas.[14]

Upon boarding M/V Big L, the Coast Guard officers and BNDD agents ordered the four individuals aboard to move toward the afterend of the boat. In the process of checking the hold for further crew members, a BNDD agent, to no one's great surprise, located the contraband.

### The Conspiracy Terminates

The four individuals found aboard M/V Big L were immediately placed under arrest,[15] Parks was arrested the following morning aboard M/V Adventurer III, and all were thereafter indicted in the Southern District of Florida. The enterprise was ended.

### Plea Bargaining

Defendants' motions to dismiss and suppress were denied. The government disclosed that it intended to use three confidential informers and agreed to make them available to defense counsel for questioning. Apparently after hav-

---

10. At the hearing on appellant's motion to suppress, BNDD agent Cooke so testified.

11. Apparently the Jamaicans anticipated entering the United States covertly to visit relatives. Warren indicated that Parks might possibly owe the Jamaicans some money as a result of the transactions.

12. Riding Rocks is at approximately 25° 15′ N; 79° 9′ W, approximately 24 miles S.E. of the point of boarding (note 1, *supra*).

13. Reminiscent of prohibition days, see United States v. Ingham, 5 Cir., 1974, 502 F.2d 1287, 1288, M/V Adventurer III was a hovering vessel, see 19 U.S.C.A. § 1401(n), note 33, *infra*.

14. It was fixed at 25° 29′ 3″ N., 79° 29′ 2″ W., based on a sighting off control lights in Miami and Bimini harbors made from C/G Dauntless at the time and recorded in the vessel's log.

15. See text accompanying note 2, *supra*.

ing interviewed at least one of these informers, defense counsel entered into plea negotiations with the government.

■ At a hearing before the Court on April 23, 1973 all defendants agreed to enter pleas of *nolo contendere*. In exchange the government promised to make specific sentencing recommendations to the Court. Before accepting the pleas, the District Court carefully instructed the defendants that while a plea of *nolo contendere* would constitute a waiver of all non-jurisdictional defects, challenges to the Court's jurisdiction could still be pursued on appeal.[16] After accepting the pleas, the Court sentenced Parks to three years, Davis to 18 months, Towne to 9 months, Winter to 6 months, and Saunders to 18 months.[17]

### Jurisdiction Over The Crime

The Jamaican appellants, Winter and Davis, were arrested on the high seas 35 miles from the coast of Florida aboard a small vessel carrying over a half ton of marijuana. We will assume, as contended by these appellants, that the boarding and arrests occurred beyond the territorial boundaries of the United States.[18] There has been no contention that either the contraband or the alien defendants were present within the territorial limits of the United States prior to the involuntary termination of the conspiracy. All three overt acts alleged in the indictment related solely to the conduct of American appellant Parks within the state of Florida which took place prior to the events on the high seas.[19]

Under these circumstances did the indictment and stipulated facts state a crime against the United States over which the District Court had jurisdiction in regard to Jamaican nationals Winter and Davis? A survey of the precedent compels us to answer affirmatively.

In Strassheim v. Daily, 1910, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735, the Court was faced with the question of whether Daily of Chicago, Illinois was properly extraditable to Michigan as a fugitive from justice, having been indicted in Michigan for bribery and obtaining money from the state on false pretenses. Acting in concert with Michigan state officials, Daily was alleged to have sold old machinery to the state, while willfully misrepresenting it was new. Assuming at the outset that Daily had not personally committed any pertinent act within the territory of Michigan, Justice Holmes, writing for a unanimous court, observed that:

> If a jury should believe the evidence, and find that Daily did the acts that led Armstrong to betray his trust, deceived the board of control, and induced by fraud the payment by the state, the usage of the civilized world would warrant Michigan in punishing him, although he never had set foot in the state until after the fraud was complete. Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power.

16. The record shows that the District Court scrupulously followed the requirements of F.R.Crim.P. 11 in accepting the pleas. The extensive hearings on the motions to dismiss and suppress, coupled with the stipulations and hearings upon entering the pleas, provided the District Court with a more than ample underlying factual basis to support the pleas.

17. The government had recommended two years for Parks and Davis, 18 months for Saunders, 18 months for Winter, and 9 months for Towne. Again with scrupulous

regard for the rights of each accused, the District Court, prior to accepting the pleas, advised the defendants that it was under no obligation to accept the government's recommendations but that it would allow any defendant who received a sentence in excess of that recommended to withdraw his plea if he so desired.

18. This is not to assume that they occurred beyond the Coast Guard's jurisdiction to arrest.

19. See note 22, *infra*.

221 U.S. at 284–85, 31 S.Ct. at 560, 55 L.Ed. at 738.

In Ford v. United States, 1927, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793, the principle was applied to facts more closely resembling those we confront. The defendants were indicted and convicted for conspiring to import liquor into the United States in violation of the prohibition laws. Appellants had been arrested with the contraband aboard a British vessel on the high seas. The jurisdiction of the District Court was challenged on the ground that some of the co-conspirators were never present within the territory of the United States during the pendency of the conspiracy. The Court dismissed this argument noting that:

> The conspiracy was continuously in operation between the defendants in the United States and those on the high seas adjacent thereto, and of the four overt acts committed in pursuance thereof, three were completed and took effect within the United States, and the fourth failed of its effect only by reason of the intervention of federal officers. In other words, the conspiring was directed to violation of the United States law within the United States, by men within and without it, and everything done was at the procuration and by the agency of each for the other in pursuance of the conspiracy and the intended illegal importation. In such a case all are guilty of the offense of conspiring to violate the United States law whether they are in or out of the Country.

273 U.S. at 620, 47 S.Ct. at 540, 71 L.Ed. at 805.

This Circuit has applied the same principle recently on several occasions. In Marin v. United States, 5 Cir., 1965, 352 F.2d 174 the Court relied on *Ford* in affirming a conviction under 21 U.S.C.A. § 174 for conspiring to smuggle heroin into the United States despite the fact that the defendant had not set foot within the United States during the pendency of the conspiracy, but a co-conspirator had committed overt acts within the United States.

In Rivard v. United States, 5 Cir., 1967, 375 F.2d 882, cert. denied sub nom. Groleau v. United States, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181, four Canadians had been convicted of conspiring to smuggle heroin into the United States although only one had entered the country during the pendency of the conspiracy. Recognizing that the United States subscribes to the objective view of the territorial principle of jurisdiction—that is "jurisdiction extends over all acts which take effect within the sovereign even though the author is elsewhere," 375 F.2d at 886 [20]—we sustained the lower court's jurisdiction over the conspiracy count pointing out that "[t]here is thus no doubt that the object of the conspiracy was to violate the narcotics laws of the United States; that the conspiracy was carried on partly in and partly out of this country; and that overt acts were committed within the United States by co-conspirators." 375 F.2d at 886.[21] Furthermore, since heroin had actually been smuggled into the United States by one of the co-defendants, the Court affirmed the conviction of another co-defendant as a principal on a substantive count of smuggling although the latter had not entered the United States prior to the completion of the crime.

And even more recently we upheld jurisdiction over acts of possession, forgery and passing of United States Social Security checks which took place wholly within Mexico since the actions were "in-

---

**20.** See Restatement of Foreign Relations Law of the United States 2d (1965) § 10 (Basis of Jurisdiction), § 17 (Jurisdiction to Prescribe With Respect to Conduct, Thing, Status, or Other Interests Within The Territory), § 18 (Jurisdiction to Prescribe With Respect to Ef-

fect Within Territory), § 38 (Territorial Interpretation of United States Law).

**21.** See also Yenkichi Ito v. United States, 9 Cir., 1933, 64 F.2d 73; United States v. Canta-La Luz, 9 Cir., 1971, 443 F.2d 413.

tended to produce and producing detrimental effects within" the United States. United States v. Fernandez, 5 Cir., 1974, 496 F.2d 1294.

■ The case law clearly establishes that the District Court has jurisdiction over a conspiracy and all those proved to be conspirators if the conspiracy is designed to have criminal effects within the United States and if there is sufficient proof that at least one of the conspirators committed an overt act in furtherance of the conspiracy within the territorial jurisdiction of the District Court.

The indictment in the instant case alleged that co-conspirator Parks committed three seemingly innocuous overt acts in furtherance of the conspiracy within the territorial jurisdiction of the United States.[22]

Admittedly in *Ford, Marion,* and *Rivard* the unlawful importation of contraband into the United States actually occurred and was thus among the overt acts established. Here the conspiracy was cut short by the long arm of the law before the actual importation could take place. This is a distinction without significance, however.

■ As we recently observed in United States v. Carlton, 5 Cir., 1973, 475 F.2d 104, 106:

The essence of the crime of conspiracy is the agreement and not the commission of the crime which is the object of the conspiracy. United States v. Rabinowich, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211. It is immaterial to the commission of the crime of conspiracy whether the object of the conspiracy is achieved. *Rabinowich, supra* [1]; Castro v. United States, *supra* [296 F.2d 540 (5th Cir.)]; and Williams v. United States, 179 F.2d 644 (5th Cir.). There must of course be an overt act done in pursuance of the conspiracy, but such act need not constitute the very crime which is the object of the conspiracy, *Rabinowich, supra.*[23]

■ An overt act, seemingly innocent in itself yet in furtherance of the conspiracy, is sufficient under the law of conspiracy. We see no reason why it should be any different for jurisdictional purposes,[24] to the extent that proof of an overt act is required.[25]

---

**22.** OVERT ACTS

1. On or about January 21, 1973 William Michael Parks boarded the vessel ADVENTURER III at Watson's Island, Miami, Florida.

2. On or about January 28, 1973 William Michael Parks arrived at the pier behind the vessel ADVENTURER III on Watson's Island, Miami, Florida.

3. On or about March 1, 1973 William Michael Parks entered the Royal Castle at Biscayne Boulevard and 10th Street, Miami, Florida.

All in violation of Title 21, United States Code, Section 963.

Since the case never went to trial, the government did not have occasion to prove any of the three alleged overt acts of Parks. We do not understand appellants to contest the government's ability to prove these acts. But in any event there was an adequate showing of jurisdictional facts to satisfy F.R. Crim.P. 11.

During the hearing on the motion to dismiss for lack of jurisdiction, BNDD agent Cooke testified that Warren had contacted the BNDD and informed it that Parks had approached him in Miami and offered to rent his boat to carry marijuana from Jamaica to the United States. The parties further entered a stipulation to the same effect. This in itself is of course evidence of an overt act in furtherance of the conspiracy within the United States.

**23.** See United States v. Morello, 2d Cir., 1957, 250 F.2d 631, 635 where the Court explicitly recognized under 21 U.S.C.A. §§ 173 and 174 of the old Narcotic Drugs Import and Export Act and 18 U.S.C.A. § 371 (the general federal conspiracy provision) that "the substantive crime of unlawful importation was not essential to prove the crime of conspiracy as charged."

**24.** A different question might be presented had these foreign nationals been charged with the substantive offense of unlawful importation or attempt to import. In that event, the Court, in the absence of a showing of agency, aider or abettor, etc., would likely have to determine whether Congress intended the statute in issue to have an extraterritorial

**25.** See note 25 on page 983.

Since appellants were clearly charged with conspiring to engage in conduct designed to have criminal effects within the United States and since an overt act in furtherance of the design was properly alleged in the indictment,[26] a crime was stated over which the United States and the District Court had jurisdiction.[27]

### Jurisdiction Over The Person

Appellants challenge the District Court's jurisdiction over their persons, contending that they were illegally arrested and unlawfully brought before the Court. Appellants contest the legality of the arrests on the following theories.[28]

(1) By arresting appellants 35 miles from the Florida coast, the Coast Guard exceeded its jurisdiction to arrest as prescribed by statute[29] and treaty which at a maximum extends to the high seas within 12 miles of the United States coast.[30]

effect. See United States v. Bowman, 1922, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149; Yenkichi Ito v. United States, 1933, 9 Cir., 64 F.2d 73; United States v. Vicars, 5 Cir., 1972, 467 F.2d 452, 456. *Cf.* Rocha v. United States, 9 Cir., 1961, 288 F.2d 545.

**25.** The indictment in the instant case was brought under 21 U.S.C. § 963 the "built-in" conspiracy provision of the Controlled Substance Import and Export Act, which, unlike 18 U.S.C.A. § 371, does not *explicitly* require proof of an overt act.

While the Ninth Circuit has held that proof of an overt act was unnecessary to prove conspiracy to smuggle under 21 U.S.C.A. § 176(a) (§ 2 of the old Narcotic Drugs Import and Export Act), Ewing v. United States, 9 Cir., 1967, 386 F.2d 10, we need not resolve the question of whether proof of an overt act is required under § 963 either as a matter of criminal law or for jurisdictional purposes since the indictment in the instant case contains such an allegation.

**26.** In addition to reliance on the overt acts of Parks alleged in the indictment, the government asserts that it could readily prove overt acts in furtherance of the conspiracy within United States territory by each defendant if necessary. This argument proceeds from the fact that all the defendants but Parks were seized along with the contraband aboard M/V Big L, an American owned and registered vessel, coupled with the often employed fiction that for purposes of criminal jurisdiction, a vessel is deemed to be part of the territory of the sovereign whose flag it flies. See Lauritzen v. Larsen, 1953, 345 U.S. 571, 585, 73 S.Ct. 921, 97 L.Ed. 1254; United States v. Flores, 1933, 289 U.S. 137, 155–59, 53 S.Ct. 580, 77 L.Ed. 1086; 18 U.S.C.A. § 7. Since we find the overt acts of Parks sufficient, we need not reach this question.

**27.** Our disposition precludes an attack on the Court's jurisdiction over the crime by American citizen Towne on the basis that he was not alleged to have committed an overt act in furtherance of the conspiracy within the United States. Of course Parks is in no position to join in these challenges since he is an American citizen alleged to have committed three overt acts in furtherance of the conspiracy within the United States.

**28.** In restating appellants' theories, we express no opinion as to their merit nor as to the validity of any of the underlying inferences or assumptions (particularly those that attempt to define the jurisdictional or territorial limitations of the United States or any other sovereign state).

**29.** 14 U.S.C.A. § 2 declares that:

The Coast Guard shall enforce or assist in the enforcement of all applicable Federal laws upon the high seas and waters subject to the jurisdiction of the United States.

The Coast Guard's enforcement authority is more specifically prescribed by 14 U.S.C.A. § 89(a) which provides:

(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon *the high seas and waters over which the United States has jurisdiction*, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of *any vessel subject to the jurisdiction, or to the operation of any law, of the United States*, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise. or any

**30.** See note 30 on page 984.

(2) By arresting appellants within 11.9 miles of the coast of the Bahamas, and hence allegedly within the exclusive territory of another sovereign foreign state, the Coast Guard violated its jurisdiction as prescribed by statute, treaty and customary international law.[31]

(3) By arresting appellants by self-help within the territory of the Bahamas, the Coast Guard violated the United States treaty of extradition with the United Kingdom.

(4) Acting in its capacity as an arm [32] of either the BNDD or the Customs Au-

part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized. (Emphasis added).

30. There is little, if any current authority, construing the jurisdictional prerequisites of the statute. Rather, most of the case law regarding enforcement authority dates from the days of prohibition and arose either pursuant to the jurisdictional provisions of the former Customs statutes authorizing boarding, search, seizure and arrest aboard any vessel within four marine leagues of the United States coast or pursuant to bilateral prohibition enforcement treaties which allow the Coast Guard (or predecessor) to board, search and arrest on a vessel of the party state within an hour's sailing distance of the coast (measured by the vessel's sailing speed). See, e. g., Ford v. United States (The Quadra), 1927, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793; United States v. Lee, 1927, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202; Maul v. United States (The Underwriter), 1927, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171; Cook v. United States (The Mazel Tov), 1933, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641; Gillam v. United States (The Vinces), 4 Cir., 1928, 27 F.2d 296; Olson v. United States (The Atlantic), 2 Cir., 1933, 68 F.2d 8; The Rosalie M., S.D.Tex., 1925, 4 F.2d 815.

Appellants urge that the term "high seas and waters over which the United States has jurisdiction" limits the Coast Guard's enforcement authority to a maximum of 12 miles from the United States coast. Appellants reach this conclusion largely in reliance on Article 24 of The Convention on the Territorial Sea and Contiguous Zone, 1958, 15 U.S.T. 1606, T.I.A.S. No. 5639, 516 U.N.T.S. 205, to which the United States is a party and which provides that a coastal state may exercise control over an area contiguous to its territorial sea but not extending beyond 12 miles from its coast for the purpose of preventing and punishing infringements of its customs, fiscal immigration and sanitary regulations. To a lesser extent, appellants rely on Article 6 of the treaty that allows a state to define the limits of its own territorial sea (presumably within the 12 mile maximum provided for the contiguous zone) in which it

may exercise exclusive control. The United States has long claimed a three mile territorial sea. See Statement of the Law of Foreign Relations of the United States 2d (1969) § 15, Reporters Note 1. See also United States v. Louisiana, 1959, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025.

The government replies that the Coast Guard may board and arrest on an American vessel at any point on the high seas or even within the foreign territorial waters in its efforts to enforce laws enacted pursuant to the "special maritime and territorial jurisdiction of the United States" which 18 U.S.C.A. § 7 defines as:

(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

31. Appellants base their claim that the vessel was in Bahamian waters on the fact that the United Kingdom (of which the Bahamas were a part at the time of the arrest) was a party to the Convention on the Territorial Sea and Contiguous Zone, note 30, supra, and thus under Article 24, the Bahamas were entitled to exercise limited control over the Contiguous Zone extending to a distance of 12 miles from its coast.

The government counters that the Coast Guard was not precluded from arresting at the point in controversy since like the United States, the United Kingdom claims only a three mile territorial sea subject to its exclusive control. See Territorial Waters Jurisdiction Act, 1878, 41 & 42 Victoria, C. 73.

32. 14 U.S.C.A. § 89(b) provides:

(b) The officers of the Coast Guard insofar as they are engaged, pursuant to the authority contained in this section, in enforcing any law of the United States shall:

(1) be deemed to be acting as agents of the particular executive department or independent establishment charged with

thority,[33] the Coast Guard violated the regulations governing those agencies by exceeding their jurisdiction to arrest.

These challenges to the Coast Guard's jurisdiction to arrest raise interesting and perhaps difficult questions of law, largely unresolved by federal precedent.

the administration of the particular law; and

(2) be subject to all the rules and regulations promulgated by such department or independent establishment with respect to the enforcement of that law.

**33.** Officers of the Customs are granted special authority to seize, search and board vessels. 19 U.S.C.A. § 1581 provides:

(a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under sections 1701 and 1703–1711 of this title, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

\*    \*    \*    \*    \*    \*

(e) If upon the examination of any vessel or vehicle it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel or vehicle, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel or vehicle, liable to forfeiture or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested.

(f) It shall be the duty of the several officers of the customs to seize and secure any vessel, vehicle, or merchandise which shall become liable to seizure, and to arrest any person who shall become liable to arrest, by virtue of any law respecting the revenue, as well without as within their respective districts, and to use all necessary force to seize or arrest the same.

(g) Any vessel, within or without the customs waters, from which any merchandise is being, or has been, unlawfully introduced into the United States by means of any boat belonging to, or owned, controlled, or managed in common with, said

We do not find it necessary to decide these questions at this time, however, since we are convinced that under well established case law of the Supreme Court and this Circuit, a defendant in a federal criminal trial whether citizen or alien, whether arrested within or beyond the territory of the United States may

vessel, shall be deemed to be employed within the United States and, as such, subject to the provisions of this section.

(h) The provisions of this section shall not be construed to authorize or require any officer of the United States to enforce any law of the United States upon the high seas upon a foreign vessel in contravention of any treaty with a foreign government enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon said vessel upon the high seas the laws of the United States except as such authorities are or may otherwise be enabled or permitted under special arrangement with such foreign government.

19 U.S.C.A. § 1401:

(l) The term "officer of the customs" means any officer of the Customs Service or any commissioned, warrant, or petty officer of the Coast Guard, or agent or other person authorized by law or by the Secretary of the Treasury, or appointed in writing by a collector, to perform the duties of an officer of the Customs Service.

(m) The term "customs waters" means, in the case of a foreign vessel subject to a treaty or other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled or permitted by such treaty or arrangement and, in the case of every other vessel, the waters within four leagues of the coast of the United States.

(n) The term "hovering vessel" means any vessel which is found or kept off the coast of the United States within or without the customs waters, if, from the history, conduct, character, or location of the vessel, it is reasonable to believe that such vessel is being used or may be used to introduce or promote or facilitate the introduction or attempted introduction of merchandise into the United States in violation of the laws respecting the revenue.

not successfully challenge the District Court's jurisdiction over his person on the grounds that his presence before the Court was unlawfully secured.

Although *Ker-Frisbie* has been severely criticized,[34] and the Second Circuit, in an extreme case of outrageous governmental conduct of physical and emotional brutality and indignity,[35] has held, on the basis of post-1960 due process decisions, that *Ker-Frisbie* bends,[36] in such situations the Supreme Court has not re-

---

34. See Dickinson, Jurisdiction Following Seizure or Arrest in Violation of International Law, 28 Am.J.Int.L. 231 (1934); Allen, Due Process and State Criminal Procedures: Another Look, 48 Nw.L.Rev. 16, 27–28 (1948); Scott, Criminal Jurisdiction of a State Over a Defendant Based Upon Presence Secured By Force or Fraud, 37 Minn.L.Rev. 91 (1953); Fairman, Ker v. Illinois Revisited, 47 Am.J. Int.L. 678 (1953) for earlier articles; and Pitlar, "The Fruit of the Poisonous Tree": Revisited and Shepardized, 56 Calif.L.Rev. 579, 600 (1968) which followed significant post-*Frisbie* Fourteenth Amendment due process decisions in the area of arrest, search and seizure, see, e. g., Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Beck v. Ohio, 1964, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 which some assert raise doubts as to the current vitality of the *Ker-Frisbie* concept. See Judge Friendly's comments in United States v. Edmons, 2 Cir., 1970, 432 F.2d 577, 583. But see United States v. Cotten, 9 Cir., 1973, 471 F.2d 744.

See also cases cited by Judge Mansfield in United States v. Toscanino, 2 Cir., 1974, 500 F.2d 267, 272–3.

35. United States v. Toscanino, 2 Cir., 1974, 500 F.2d 267, en banc rehearing denied 504 F.2d 1380 (Mulligan & Timbers, JJ., dissenting). See United States v. Herrera, 5 Cir., 1974, 504 F.2d 859, 860.

36. Indeed, with the ink scarcely dry on *Toscanino*, in the unsuccessful effort to have it reheard en banc, the Second Circuit in an opinion by Chief Judge Kaufman, Lujan v. Gengler, 2 Cir., 1975, 510 F.2d 62, has limited *Toscanino* to outrageous situations.

In circumstances that show much more in the way of government excesses or so-called high-handed treatment on the high seas, they declined to extend *Toscanino* to these situations not involving degrading, egregious, outrageous and flagrant indignities to human personality.

The conduct found insufficient to warrant dismissal was described by the Court:

Lujan, a licensed pilot, was hired in Argentina by one Duran to fly him to Bolivia. Although Duran represented that he had business to transact there with American interests in Bolivian mines, he in fact had been hired by American agents to lure Lujan to Bolivia. When Lujan landed in Bolivia on October 26, 1973, he was promptly taken into custody by Bolivian police who were not acting at the direction of their own superiors or government, but as paid agents of the United States. Lujan was not permitted to communicate with the Argentine embassy, an attorney, or any member of his family.

On the following day the Bolivian police . . . took Lujan . . . to La Paz, where he was held until November 1, 1973. . . . Bolivian police, acting together with American agents, brought Lujan to the airport and placed him on a plane bound for New York . . . at Kennedy Airport Lujan was formally arrested by federal agents.

*Lujan, supra,* 510 F.2d at 63. The Court described *Toscanino* as presenting "conduct of the most outrageous and reprehensible kind . . . ." *Id.*

Yet in recognizing that Ker and Frisbie no longer provided a carte blanche to government agents bringing defendants from abroad to the United States [by the use of torture, brutality and similar outrageous conduct, we did not intend to suggest that any irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court. In holding that Ker and Frisbie must yield to the extent they were inconsistent with the Supreme Court's more recent pronouncements, we scarcely could have meant to eviscerate the Ker-Frisbie rule, which the Supreme Court has never felt impelled to disavow.]

*Id.* at 65. However, the Court continued by stating that the outrageous treatment inflicted on Toscanino "brought [this] case within the *Rochin* [Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183] principle and demanded * * * a remedy." *Id.,* 510 F.2d at 65.

But the same cannot be said of Lujan. It requires little argument to show that the government conduct of which he complains pales by comparison with that alleged by Toscanino . . . which sinks to a violation of due process. * * * *Id.*

ceded from *Ker*[37] or *Frisbie*,[38] and neither has this Court.[39]

■ Indeed, just recently, we rejected the Second Circuit's approach in *Toscanino*[40] and held *Ker-Frisbie* applicable to a non-resident alien claiming unlawful abduction from Peru:

> [Herrera] also urges a loss of jurisdiction by reason of the failure of the United States to follow the orderly processes of extradition under the treaty between the United States and Peru.
>
> It is settled by both Supreme Court decisions and decisions of this court that these contentions are without merit. Ker v. Illinois, 1886, 119 U.S. 436, 444, 7 S.Ct. 225, 30 L.Ed. 421; Frisbie v. Collins, 1952, 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541; United States v. Caramian, 5 Cir., 1972, 468 F.2d 1370, 1371; United States v. Vicars, 5 Cir., 1972, 467 F.2d 452, 455;

**37.** In Ker v. Illinois, 1886, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421, a United States citizen was forcibly removed from Peru for trial in an Illinois state court. The Court held that a defendant who has been convicted in a state court may not challenge the indictment or a conviction thereunder on the ground that he was improperly brought within the Court's jurisdiction in violation of his Fourteenth Amendment right to due process of law. The Court further held that since the treaty of extradition between the United States and Peru did not confer a right to asylum on the defendant, he could not object to the fact that the state of Illinois had acquired custody over him through self-help rather than legal process.

Eleven years later in Ex Parte Johnson, 1897, 167 U.S. 120, 17 S.Ct. 735, 42 L.Ed. 103, the Court clearly indicated that the *Ker* doctrine was equally applicable to defendants in federal criminal proceedings.

**38.** In Frisbie v. Collins, 1952, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541, the Supreme Court reconsidered and unanimously reaffirmed the continuing viability of the *Ker* doctrine. Rejecting the claim that abduction and transfer of the defendant was itself a federal kidnapping, the Court, through Mr. Justice Black, declared:

This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction."[7] No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

342 U.S. at 522, 72 S.Ct. at 511.

**39.** In our recent case of United States v. Vicars, 5 Cir., 1972, 467 F.2d 452, we stated this summary of the law.

Even if, as Gonzales claims, he was illegally arrested in the Panama Canal Zone and brought to the United States, this is not grounds for requiring that the trial court release and discharge him without trial. E. g., Frisbie v. Collins, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541, 545 (1952) ("This Court has never departed from the rule . . . that the power of a court to try a person for crime is not impaired by the fact that he has been brought within the court's jurisdiction by reason of a 'forcible abduction.' "); Stamphill v. Johnston, 136 F.2d 291, 292 (9th Cir.) cert. denied, 320 U.S. 766, 64 S.Ct. 70, 88 L.Ed. 457 (1943) ("The personal presence of a defendant before a District Court gives that court complete jurisdiction over him, regardless of how his presence was secured, whether by premature arrest . . . wrongful seizure beyond the territorial jurisdiction of the court . . . false arrest . . . '[or extradition arising out of an offense other than the one for which he is being tried]"); United States ex rel. Voigt v. Toombs, 67 F.2d 744 (5th Cir. 1933), petition for cert. dismissed, 291 U.S. 686, 54 S.Ct. 442, 78 L.Ed. 1072 (1934) ("It is well settled in the courts of the United States that jurisdiction once acquired in a criminal case is not impaired by the manner in which the accused is brought before the court.").
467 F.2d at 455-6.
Note: The bracketed portion is of doubtful validity in view of United States v. Rauscher, 1886, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425. See also United States v. Caramian, 5 Cir., 1972, 468 F.2d 1370.

**40.** United States v. Herrera, 5 Cir., 1974, 504 F.2d 859, and 507 F.2d 143 (1975), where we reincarnate United States v. Farias, 5 Cir., 1974, 488 F.2d 852 (en banc) and Amaya v. United States Bd. of Parole, 5 Cir., 1973, 486 F.2d 940.

United States v. Cotten, 9 Cir., 1973, 471 F.2d 744, 748; Hobson v. Crouse, 10 Cir., 1964, 332 F.2d 561.

United States v. Herrera, 5 Cir., 1974, 504 F.2d 859, 860. Bound as we are by *Herrera,* we think that as the Second Circuit recognized in *Lujan,* mere errors or the exertion of action by agents beyond the strict territorial limit does not make the conduct so outrageous as to invoke these more drastic remedies.

Despite strenuous efforts by appellants to distinguish *Ker* and its progeny, we are convinced that they are controlling as to all appellants.

■ On its own facts, *Ker* precludes an attack on the District Court's jurisdiction over the American citizens Towne and Parks[41] since Ker himself was an American citizen forcibly abducted out of another foreign sovereign state and returned to the United States to stand trial.

### Ker-Frisbie And Nonresident Aliens

■ The Jamaican appellants Winter and Davis argue that *Ker-Frisbie* does not preclude nonresident aliens illegally seized outside of the territory of the United States and forcibly brought before a federal District Court from challenging its jurisdiction over their persons despite the fact that American citizens similarly seized would quite clearly be precluded from successfully raising such a defense. We have not discovered any precedent in which the Courts have directly confronted this issue.[42]

In *Ford,* the defendants were seized aboard a British vessel 25 miles from the United States coast and brought into the United States where they were indicted and convicted for conspiring to violate the prohibition laws. The United States and Britain had entered into a treaty which permitted the United States to board any British vessel within an hour's sailing distance of the United States coast and make searches and arrests necessary to the enforcement of the prohibition laws. Since the S/S Quadro was clearly beyond an hour's sailing distance of the coast, the Court was willing to conclude that the boarding officers had exceeded their jurisdiction to arrest.

With that background it considered the challenge to the trial court's jurisdiction over the persons of the defendants, but ultimately sustained the convictions.[43]

In *Schouweiler* and *Ferris,* the defendants were arrested aboard Panamanian

---

**41.** We give separate consideration to Parks' challenge to the Court's jurisdiction over his person. See notes 46 and 47, *infra,* and accompanying text.

**42.** Frequently, the opinions which have found *Ker* controlling fail to state whether the defendants alleging illegal arrest or abduction are American citizens or aliens. See, e. g., United States v. Vicars, *supra;* United States v. Caramian, *supra.*

These appellants place great weight on three prohibition-era cases to distinguish *Ker.* Ford v. United States, 1927, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793; United States v. Schouweiler, S.D.Cal., 1927, 19 F.2d 387; United States v. Ferris, N.D.Cal., 1927, 19 F.2d 925.

**43.** The Court stated:

The Solicitor General answers, on the authority of Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421, that an illegal seizure would not have ousted the jurisdiction of the court to try the defendants. But the *Ker* case does not apply here. It related to a trial in a state court, and this court found that the illegal seizure of the defendant therein violated neither the federal Constitution, nor a federal law, nor a treaty of the United States, and so that the validity of their trial after alleged seizure was not a matter of federal cognizance. Here a treaty of the United States is directly involved, and the question is quite different.

But there is a reason why this assignment of error cannot prevail. The issue whether the ship was seized within the prescribed limit did not affect the question of the defendants' guilt or innocence. It only affected the right of the court to hold their persons for trial. It was necessarily preliminary to that trial. The proper way of raising the issue of fact of the place of seizure was by a plea to the jurisdiction. A plea to the jurisdiction must precede the plea of not guilty. Such a plea was not filed. The effect of the failure to file it was to waive the question of the jurisdiction of the persons of defendants.

273 U.S. at 605–06, 47 S.Ct. at 535, 71 L.Ed. at 799.

vessels well beyond an hour's sailing distance of the coast and brought into the United States where they were indicted for conspiring to violate the prohibition laws. The United States and Panama had entered into a treaty similar to the one involved in *Ford.* Faced with a timely plea to the Court's jurisdiction over the persons of the defendants, the District Courts for the Northern and Southern Districts of California dismissed the indictment in reliance on *Ford.*

Despite certain factual similarities, we do not believe that *Ford* will suffice to rescue the alien defendants from the preclusive grasp of *Ker-Frisbie. Ford, Ferris* and *Schouweiler* all emphasized that the arrests in issue were in clear violation of a *treaty* limiting the right of the United States to *board* the vessels of another sovereign nation. Our case by contrast involves neither the violation of a treaty [44] nor a reproach to the vessels of another power. We doubt that *Ford* is at all applicable in the absence of these operative factors.

In addition, the continuing viability of *Ford* may well have been significantly undermined even on its own facts, by *Frisbie. Ford's* treatment of the challenge to jurisdiction of the person based on a violation of treaty appears consonant with *Ker's* reluctance to find a violation of due process "unless there was some *positive provision* of the constitution or of the laws of this country violated in bringing him into court . . .." 119 U.S. at 440, 7 S.Ct. at 227, 30 L.Ed. at 423 (emphasis added). In *Ford* the violation of the treaty constituted such a violation of a *positive provision* of federal law.

In *Frisbie*, however, the Court was willing to assume a violation of the federal Kidnapping Act—clearly a positive provision of federal law—and yet still find the *Ker* doctrine dispositive.

We conclude that *Ker-Frisbie* applies to the nonresident aliens as well.[45]

### The Separate Claims Of Parks

Due to the individual circumstances of Parks' arrest[46] he undertakes to assert different attacks from those of his unsuccessful co-appellants.

Parks through his very knowledgeable counsel attempts to lay out a course in the tortuous waters between Scylla and Charybdis. Recognizing that on the porthand, as an American having been arrested within the territorial limits

---

**44.** The articles of the treaty referred to, note 30, *supra*, speak in terms of the right of the adjacent power to control and regulate limited governmental activities within the area specified. They do not deal with that more sensitive matter of one sovereign obtaining from another permission to board and if necessary arrest foreign nationals on a vessel of such foreign nation, an act which, in the absence of a treaty, would be a violation of freedom of the High Seas. (See, for example, how scrupulous the United States was to distinguish between control and exploitation of the seabed and its resources from any claim of comparable exclusivity over the International High Seas above the seabed. Outer Continental Shelf Lands Act, § 3, 43 U.S.C.A. § 1332. Rodrigue v. Aetna Casualty & Surety Co., 1969, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360, 1969 AMC 1082.)

**45.** With the *Ford* treaty theory rejected, we can perceive no rational basis for drawing any distinction between citizens and nonresi-dent aliens. Under the Equal Protection Clause, the Courts have held that in certain contexts *resident* aliens are entitled to the same rights as American citizens. See, e. g., Takahashi v. Fish and Game Commission, 1948, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (state statute denying fishing license to *resident* aliens unconstitutional); Graham v. Richardson, 1971, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (state statute denying assistance benefits to *resident* alien unconstitutional); In re Griffiths, 1973, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (state statute denying *resident* alien opportunity to take bar exam unconstitutional). We are unaware of any context, however, in which an alien has greater rights under law in our Courts than an American citizen. Indeed, such a circumstance might in itself raise serious questions of equal protection.

**46.** Parks was arrested in Miami harbor after he was discovered hiding aboard M/V Adventurer III following the arrests of the other appellants aboard M/V Big L.

of the United States, he cannot challenge the District Court's jurisdiction over his person based on the illegal arrest of others on the high seas,[47] and, on the starboard hand under *Sepe*[48] the validity of a search and seizure cannot ordinarily escalate to a reserved "jurisdictional" issue, he tries by dead reckoning to steer a middle course. Divining it as best we can, Parks argues that the Coast Guard illegally boarded and searched the vessel, discovered the contraband and then made the arrests, and consequently the arrest of co-appellants aboard M/V Big L, as well as Parks' own arrest aboard M/V Adventurer III in Miami, were fruits of an illegal search.[49]

But this theory founders on either the left or right and if—and it is a big if—the Odyssean (after Odysseus) course is a "jurisdictional" one then it stands on the merits. In the circumstances of this case—which, like *Mizell, supra,* proves again the wisdom of *Sepe's* limitations—we decline to transplant the roots of the poisonous tree to the 460 fathom deep seabed westward of the Great Bahama Bank.[50] As to the so-called internationally illegal boarding and "search" of M/V Big L, Parks, on the kind of record *Sepe* permits, cannot begin to show that his identity or connection with the enterprise was due to the operation "High Seas." He had already been tagged by the owner of Adventurer III, whose reliability was sufficiently established by his continuous contact with the agents spelling out exact times, places, loading, departure and planned rendezvous. To connect Parks with the enterprise did not depend on what was *found* aboard M/V Big L.

At the least, for a *Sepe* plea-showing this confirmed the existence of the plan—facts which, independent of the half ton of contraband, could have been proved by the presence of the "planted" crew members and the close surveillance of hovering agents aloft and aboard C/G Dauntless,—so close in fact, as to have precipitated all these International law problems with the admittedly High Seas but a tenth of a mile off.

### Need For Repleading

As each of the "jurisdictional" issues asserted by each appellant have

**47.** In view of *Ker, Frisbie* and *Vicars,* Parks' counsel was careful not to phrase his theory in terms of a challenge to the Court's jurisdiction over the person.

**48.** United States v. Sepe, 5 Cir., 1973, 486 F.2d 1044 (en banc). While *Sepe* permits a defendant to enter a guilty or *nolo* plea and yet preserve a challenge to the Court's jurisdiction (whether personal or subject matter) on appeal, a defendant who has pleaded under such a court approved reservation may not renew a motion to suppress on appeal simply by invoking the magic words "jurisdictional-defect" and phrasing his argument as a challenge to the arresting officer's jurisdiction to search or arrest.

Both court and counsel were aware of the limitations on a *Sepe nolo* plea. Parks' attorney was fully aware of *Sepe* and its implications since he had been counsel both at trial and on appeal in *Sepe* as well as in United States v. Caraway, 5 Cir., 1973, (en banc), 483 F.2d 215 (dismissed as moot) vacating 474 F.2d 25, the two cases in this Circuit in which the issue had then arisen.

The District Court was well acquainted with the panel decision in *Sepe* (subsequently affirmed en banc) and time and again warned counsel that it simply would not accept a plea reserving the right to appeal defects other than challenges to the *Court's* jurisdiction. At one point during the hearing on the pleas, the Court stated emphatically:

With respect to the motion to dismiss, and the motion for the suppression of the evidence, to the extent that the jurisdiction of the Court is involved in the latter motion, I will accept a plea of no contest and it may be sent up to the Court of Appeals on the stipulated facts and the sentences that are imposed, but with respect to any other defense that is ordinarily waived by a plea of guilty, I will not accept a plea of no contest.

**49.** Parks challenges the search and seizure on the grounds that the Coast Guard (i) acting as an arm of the BNDD or Customs Authority (pursuant to 14 U.S.C.A. 89(b)(1) and (2)) exceeded its authority in that the search was not a legitimate border search (see notes 32 and 33, *supra,* and accompanying text); (ii) the vessel searched was beyond the jurisdiction of the Coast Guard and within the exclusive jurisdiction of another sovereign state (see note 31, *supra,* and accompanying text).

**50.** See C&GS chart 1112 in evidence.

been found wanting, we have given full faith to the District Court's agreement on the *nolo* plea. No one has been misled. The bargain has been kept on all sides. The conditions of the provisional pleas have been fully respected. There is therefore no basis for remanding for repleading.

Affirmed.